**CITY OF ALBUQUERQUE,**
**Plaintiff–Appellant,**

v.

**Carol BROWNER, or her successor as Administrator, United States Environmental Protection Agency, Defendant–Appellee,**

**The Western Coalition of Arid States; Metropolitan Sewerage Agencies; New Mexico Municipal League, Inc.; New Mexico Environment Department; State of New Mexico; and Pueblo of Isleta, Amici Curiae.**

No. 93–2315.

United States Court of Appeals,
Tenth Circuit.

Oct. 7, 1996.

Bruce S. Garber of Garber and Hallmark, P.C., Santa Fe, New Mexico (Cullen Hall-

mark of Garber and Hallmark, P.C., Santa Fe, New Mexico; Robert M. White, City Attorney; and Gregory P. Smith, Assistant City Attorney, City of Albuquerque, Albuquerque, New Mexico, with him on the briefs), for Plaintiff–Appellant.

Elizabeth A. Peterson, Attorney, Department of Justice, Washington, DC (Lois J. Schiffer, Assistant Attorney General, Department of Justice, Washington, DC; John J. Kelly, United States Attorney, and John W. Zavitz, Assistant United States Attorney, District of New Mexico, Albuquerque, New Mexico; Elizabeth M. Ahern and David C. Shilton, Attorneys, Department of Justice, Washington, DC; Randolph L. Hill, U.S. Environmental Protection Agency, Office of the General Counsel, Washington, DC, and Pat Rankin, U.S. Environmental Protection Agency, Office of Regional Counsel, Dallas, Texas, of counsel), with her, on the brief for Defendant–Appellee.

Jerome C. Muys of Will & Muys, P.C., Washington, DC, on the brief, for amicus curiae Western Coalition of Arid States.

Lee C. White, Washington, D, on the brief, for amicus curiae Metropolitan Sewerage Agencies.

Steven Barshov of Sive, Paget & Riesel, P.C., New York City; Richard L.C. Virtue and Stephany S. Wilson of Taichert, Wiggins, Virtue, Wilson & Najjar, Santa Fe, New Mexico, on the brief, for amicus curiae New Mexico Municipal League.

Tom Udall, Attorney General of New Mexico; Alletta Belin, Assistant Attorney General; and Tracy M. Hughes, Special Assistant Attorney General, New Mexico Environment Department, Santa Fe, New Mexico, on the brief, for amicus curiae New Mexico Environment Department and State of New Mexico.

L. Lamar Parrish of Ussery & Parrish, P.A., Albuquerque, New Mexico, on the brief, for amicus curiae Pueblo of Isleta.

Before HENRY and McKAY, Circuit Judges, and JENKINS,[*] Senior District Judge.

McKAY, Circuit Judge.

The City of Albuquerque [Albuquerque] filed a complaint challenging the U.S. Environmental Protection Agency's [EPA] approval of the Pueblo of Isleta's [Isleta Pueblo] water quality standards on numerous grounds. After denying Albuquerque a temporary restraining order and a preliminary injunction, the district court denied its motion for summary judgment while granting the Defendant EPA's motion for summary judgment. *City of Albuquerque v. Browner,* 865 F.Supp. 733 (D.N.M.1993). Albuquerque now appeals the district court's judgment.

## I. Background

In 1987, Congress amended the Clean Water Act to authorize the Defendant EPA to treat Indian tribes as states under certain circumstances for purposes of the Clean Water Act.[1] Through the amendment Congress merged two of the four critical elements necessary for tribal sovereignty—water rights and government jurisdiction [2]—by granting tribes jurisdiction to regulate their water resources in the same manner as states.[3] Congress's authorization for the EPA to treat Indian tribes as states preserves the right of tribes to govern their water resources within the comprehensive statutory framework of the Clean Water Act. This case involves the first challenge to water

---

[*] The Honorable Bruce S. Jenkins, Senior United States District Judge for the District of Utah, sitting by designation.

1. Clean Water Act, Pub.L. No. 92–500, 86 Stat. 896 (Oct. 18, 1972), as amended by Act of Feb. 4, 1987, Pub.L. No. 100–4, tit. V, § 506, 101 Stat. 76 (codified at 33 U.S.C. §§ 1251—1387).

2. The other two critical elements to tribal sovereignty are land and mineral rights.

3. *See* Amicus Curiae Br. of the New Mexico Municipal League in Support of Appellant City of Albuquerque, Ex. B at CRS–8, CRS–11 (Memo from Library of Congress, Congressional Research Service, American Law Division, to Senate Select Committee on Indian Affairs, regarding the Extent of Tribal Jurisdiction under Section 518 of the Clean Water Act (Feb. 21, 1991)).

quality standards adopted by an Indian tribe under the Clean Water Act amendment.[4]

The Rio Grande River flows south through New Mexico before turning southeast to form the border between Texas and Mexico. Plaintiff City of Albuquerque operates a waste treatment facility which dumps into the river approximately five miles north of the Isleta Pueblo Indian Reservation. The EPA recognized Isleta Pueblo as a state for purposes of the Clean Water Act on October 12, 1992. The Isleta Pueblo adopted water quality standards for Rio Grande water flowing through the tribal reservation, which were approved by the EPA on December 24, 1992.[5] The Isleta Pueblo's water quality standards are more stringent than the State of New Mexico's standards.

The Albuquerque waste treatment facility discharges into the Rio Grande under a National Pollution Discharge Elimination System [NPDES] permit issued by the EPA. The EPA sets permit discharge limits for waste treatment facilities so they meet state water quality standards. Albuquerque filed this action as the EPA was in the process of revising Albuquerque's NPDES permit to meet the Isleta Pueblo's water quality standards.

In its complaint, Albuquerque challenged the EPA's approval of Isleta Pueblo's water quality standards on numerous grounds.[6] The district court denied Albuquerque's request for a temporary restraining order and a preliminary injunction. Then, the district court denied Plaintiff's motion for summary judgment while granting the Defendant EPA's motion for summary judgment.

Albuquerque now appeals the district court's judgment. On April 15, 1994, Albuquerque, the EPA, the State of New Mexico, and Isleta Pueblo agreed to a new four-year NPDES permit for Albuquerque pursuant to a stipulation and agreement. The stipulation and agreement does not mention the claims in this suit, and the EPA's regulations and the Isleta Pueblo's revised water quality standards are in effect. During the briefing stage of this appeal, Albuquerque filed a motion requesting an order vacating the dis-

4. The Clean Water Act provides two measures of water quality. One measure is an "effluent limitations guideline." Effluent limitations guidelines are uniform, technology-based standards promulgated by the EPA, which restrict the quantities, rates and concentrations of specified substances discharged from point sources. *See* 33 U.S.C. §§ 1311, 1314. The other measure of water quality is a "water quality standard." Unlike the technology-based effluent limitations guidelines, water quality standards are not based on pollution control technologies, but express the desired condition or use of a particular waterway. Water quality standards supplement technology-based effluent limitations guidelines "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 2025 n. 12, 48 L.Ed.2d 578 (1976). In this case, the water quality standards of the Isleta Pueblo are at issue.

There are three elements of water quality standards under the Clean Water Act: (1) one or more designated "uses" of each waterway (e.g., public water supply, recreation, or agriculture) consistent with the goals of the Act as articulated in 33 U.S.C. § 1251; (2) "criteria" expressed in numerical concentration levels or narrative statements specifying the amount of various pollutants that may be present in the water and still protect the designate uses; and (3) an anti-degradation provision. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131 (1995).

5. The EPA provides states with substantial guidance in drafting water quality standards. States must adopt criteria that protect the designated uses. 40 C.F.R. § 131.11 (1995). The Clean Water Act requires the EPA to develop criteria for water quality that reflect the latest scientific knowledge, and to provide those criteria to the states as guidance. 33 U.S.C. § 1314(a). States can draw upon the EPA's recommended water quality criteria or use other criteria for which they have sound scientific support. *See* 40 C.F.R. § 131.11 (1995).

Prior to adopting or revising any water quality standard, the state must provide notice and an opportunity for a public hearing. 40 C.F.R. § 131.10(e) (1995). The criteria may be based on EPA guidance, EPA guidance modified to reflect conditions at the site, or on other scientifically defensible methods. *Id.* After adoption, the states must submit the water quality standards to the EPA for review and approval. 33 U.S.C. § 1313(c)(2). The EPA reviews the state's water quality standards to ensure that they are consistent with the Act's requirements. *Id.* at § 1313(c)(3).

6. Albuquerque's suit names only the EPA as a defendant. The Isleta Pueblo is amicus curiae in support of the EPA in the suit.

trict court's judgment due to mootness and remand with instructions to dismiss its complaint without prejudice.

Albuquerque has raised seven issues on appeal: (1) whether the district court's opinion and order should be vacated because the case is mooted by an agreement negotiated by the parties; (2) whether the EPA reasonably interpreted § 1377 of the Clean Water Act as providing the Isleta Pueblo's authority to adopt water quality standards that are more stringent than required by the statute, and whether the Isleta Pueblo standards can be applied by the EPA to upstream permit users; (3) whether the EPA complied with the Administrative Procedure Act's notice and comment requirements in approving the Isleta Pueblo's standards under the Clean Water Act; (4) whether the EPA's approval of the Isleta Pueblo's standards was supported by a rational basis; (5) whether the EPA's adoption of regulations providing for mediation or arbitration to resolve disputes over unreasonable consequences of a tribe's water quality standards is a reasonable interpretation of § 1377(e) of the Clean Water Act; (6) whether the EPA's approval of the Isleta Pueblo's ceremonial use designation offends the Establishment Clause of the First Amendment; and (7) whether the Isleta Pueblo's standards approved by the EPA are so vague as to deprive Albuquerque of due process.

Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Albuquerque's challenge of the EPA's decision is not premised on disputed facts; rather, it asserts that the EPA was not entitled to judgment as a matter of law. We review the district court's summary judgment de novo, using the standards that were applicable in the district court. *Pueblo of Sandia v. United States,* 50 F.3d 856, 859 (10th Cir.1995); *Lewis v. Babbitt,* 998 F.2d 880, 881 (10th Cir.1993).

## II. Mootness

As a preliminary issue, Albuquerque has filed a motion to vacate the district court's opinion and order and to remand this action

to the district court with instructions to dismiss their complaint without prejudice. As a basis for this motion, Albuquerque asserts that the case is mooted by a negotiated agreement whereby Albuquerque, the EPA, the State of New Mexico, and the Isleta Pueblo have each agreed to a new four-year NPDES permit for the Albuquerque waste facility. Thus, Albuquerque asserts that under *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), we should vacate the judgment and dismiss the complaint without prejudice.

We deny Albuquerque's motion because the case is not moot. "The burden of demonstrating mootness 'is a heavy one.'" *Los Angeles County v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). Under the mootness doctrine, "'a case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383 (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969)). The settlement agreement, which fails to even mention this case, does not resolve this suit. Under the settlement, the EPA has not withdrawn its approval of the Isleta Pueblo standards or changed its regulations. A "live" controversy still exists here because the parties still disagree about whether the EPA's approval of the Isleta Pueblo standards is lawful under the Clean Water Act and the U.S. Constitution and whether the EPA's regulations are consistent with the Act.

Parties lack a legally cognizable interest in the outcome of a case if "(1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, . . . and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383 (citations omitted). The parties in this case have retained a legally cognizable interest because the Isleta Pueblo water quality standards and the EPA's regulations challenged in Albuquerque's suit are still in force. The stipu-

lation and agreement settled issues concerning only the EPA's issuance of Albuquerque's NPDES permit. In this case, Albuquerque is challenging the EPA's regulations and the Agency's approval of water quality standards under the Clean Water Act, not the issuance of an NPDES permit.[7] Under the circumstances, there is no reasonable expectation that the alleged violation will not recur, and the settlement agreement has not completely and irrevocably eradicated the effects of the alleged violation. *See FDIC v. Jennings,* 816 F.2d 1488, 1491 (10th Cir.1987) (settlement that does not resolve all issues does not moot action). Thus, this action is not mooted because the stipulation and agreement is not a final settlement of all claims brought in the City's suit.

Even if this action were moot, we would not grant vacatur because Plaintiff's motion appears to be merely an attempt to expunge the district court's adverse decision, giving the City the option to relitigate this action at some later date. The Supreme Court recently explained that mootness by reason of settlement does not justify vacatur of a federal civil judgment under review absent exceptional, equitable circumstances. *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* —— U.S. ——, ——, ——, 115 S.Ct. 386, 392, 393, 130 L.Ed.2d 233 (1994). In some cases where a case becomes moot on appeal through happenstance, it is proper for the appellate court to vacate the judgment of the district court. *Munsingwear,* 340 U.S. at 39, 71 S.Ct. at 106. Happenstance does not include cases resolved by actions attributable to the parties, such as a negotiated settlement. *U.S. Bancorp Mortgage,* —— U.S. at ——––——, 115 S.Ct. at 391–92; *Oklahoma Radio Assocs. v. FDIC,* 3 F.3d 1436, 1439 (10th Cir.1993). The mootness alleged by Albuquerque is not happenstance; rather, it results from the Plaintiff's voluntary settlement of issues related to the EPA's issuance of the NPDES permit.

Also, we will not apply the *Munsingwear* rule where "the losing party, fearful of having its loss confirmed by the appellate court, abandons the appeal and then moves to have the trial court's judgment vacated as moot, thus 'retiring to lick its wounds, fully intending to come out fighting again.'" *Harris v. Board of Governors of the Federal Reserve Sys.,* 938 F.2d 720, 724 (7th Cir.1991) (quoting *Commodity Futures Trading Comm'n v. Board of Trade,* 701 F.2d 653, 656 (7th Cir. 1983)). Albuquerque was not required to pursue this appeal. If Plaintiff desired to end this case in good faith, it could have filed at any time a motion for voluntary dismissal. Plaintiff's motivations in filing the motion are highly suspect; dismissing this suit as moot and vacating the judgment could result in unfairness to the Defendant by exposing the Agency to the possibility of renewed actions by the Plaintiff.

We deny Plaintiff's motion to dismiss this suit and to vacate the district court's judgment because we do not find the case moot; and even if the case were moot, vacatur could result in an unfair result for the Defendant.

### III. Tribal Sovereignty Under the Clean Water Act

Albuquerque acknowledges that the 1987 amendment to the Clean Water Act authorizes the EPA to treat tribes as states. Act of Feb. 4, 1987, Pub.L. No. 100–4, tit. V, § 506, 101 Stat. 76 (codified as amended at 33 U.S.C. § 1377). Albuquerque contends, however, that 33 U.S.C. § 1377 does not allow tribes to establish water quality standards more stringent than federal standards and does not permit tribal standards to be enforced beyond tribal reservation boundaries.

In *Chevron, USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the Supreme Court established a two-step approach to judicial review of agency interpretations of acts of Congress. First, the reviewing court must determine whether there is a clear and unambiguous congres-

---

**7.** The approval of water quality standards and the issuance of an NPDES permit are two different administrative actions. The issuance of an NPDES permit under the Clean Water Act is subject to direct review by the court of appeals.

33 U.S.C. § 1369(b)(1)(F). The approval of water quality standards is initially reviewed by the district courts under the Administrative Procedure Act. *See, e.g., Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 518 (2d Cir.1976).

sional intent concerning the precise question at issue. If congressional intent is clear and unambiguous, then that intent is the law and must be given effect. A reviewing court proceeds to the second step "if the statute is silent or ambiguous with respect to the specific issue." *Id.* at 843, 104 S.Ct. at 2782. Then, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The EPA, however, is entitled to considerable deference in its interpretation of the Clean Water Act because it is charged with administering the Act. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83; *see also Arkansas v. Oklahoma,* 503 U.S. 91, 112, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (criticizing this Court for failing to afford the EPA's interpretation of the Clean Water Act "an appropriate level of deference").

In regard to the first question at issue, we reach the second step of *Chevron* because congressional intent is unclear and ambiguous. Under Albuquerque's interpretation of § 1377, tribes could devise water quality standards which are neither more nor less stringent than federal standards. Albuquerque's statutory construction is based on a negative implication inferred from Congress's failure to incorporate all provisions of the Clean Water Act in § 1377(e). We find that Congress's intent is unclear and ambiguous in regard to § 1377(e) but that the EPA's construction of the 1987 amendment to the Clean Water Act is reasonable and permissible.

Congress's objective in the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through the elimination of pollutant discharge into those waters. 33

U.S.C. § 1251(a). Through the Act, Congress designed a comprehensive regulatory scheme that recognized and preserved a primary role for the states in eliminating pollution from our waterways. 33 U.S.C. § 1251(b). The power of states under the Act is underlined by their ability to force the development of technology by setting stringent water quality standards that the EPA can enforce against upstream polluters. *See* 33 U.S.C. §§ 1311(k), 1341, 1342, 1370; *Arkansas,* 503 U.S. at 106, 112 S.Ct. at 1056–57 (holding that the EPA's requirement that NPDES dischargers must comply with downstream States' water quality standards was a reasonable exercise of the agency's statutory discretion pursuant to §§ 1341, 1342). In the Clean Water Act, Congress provided the EPA "substantial statutory discretion." *Arkansas,* 503 U.S. at 107, 112 S.Ct. at 1057. Pursuant to the 1987 amendment of the Clean Water Act, the EPA can treat Indian tribes as states under the Act, provided that the tribes meet certain criteria listed in 33 U.S.C. § 1377(e) and 40 C.F.R. § 131.8(a).[8] The 1987 amendment further provides:

(a) Policy

Nothing in this section shall be construed to affect the application of section 1251(g) of this title, and all of the provisions of this section shall be carried out in accordance with the provisions of such section 1251(g) of this title. Indian tribes shall be treated as States for purposes of such section 1251(g) of this title.

. . . .

(e) Treatment as States

The Administrator is authorized to treat an Indian tribe as a State for purposes of subchapter II of this chapter and sections

---

**8.** To qualify as a state under the Act, an Indian tribe must submit an application to the EPA which includes: a statement that the tribe is recognized by the Secretary of the Interior; a descriptive statement demonstrating that the tribal governing body is currently carrying out substantial government functions over a defined area; a description of the tribe's authority to regulate water quality over certain waters; a description of the tribe's capability to administer an effective water quality standards program; and any additional documentation which the Administrator deems necessary to support a tribal application. 40 C.F.R. § 131.8 (1995).

Upon receipt of the application, the Regional Administrator will notify appropriate government entities of the tribe's application and the basis of the tribe's authority to regulate water quality. The Administrator provides a thirty-day period to receive comments on the tribe's assertion of authority. If comments challenge the tribe's authority, the Regional Administrator, after consulting with the Secretary of the Interior, shall determine whether the tribe meets the requirements of 40 C.F.R. § 131.8(a)(3) (1995). Once recognized as a state for purposes of the Act, a tribe may submit proposed water quality standards to EPA.

1254, 1256, 1313, 1315, 1318, 1319, 1324, 1329, 1341, 1342, and 1344 of this title to the degree necessary to carry out the objectives of this section, . . . .

33 U.S.C. § 1377(a), (e).[9]

In its letter approving the Isleta Pueblo's standards, the EPA cites 33 U.S.C. § 1370 as the basis for Isleta Pueblo's authority to set water quality standards that are more stringent than those recommended by the EPA under the Clean Water Act.[10] Albuquerque argues that tribes cannot adopt discharge limits more stringent than those of the EPA because § 1377 does not make reference to § 1370. Section 1370 prohibits states from imposing standards which are less stringent than those imposed by the federal government, while acknowledging states' inherent right to impose standards or limits that are more stringent than those imposed by the federal government.[11] 33 U.S.C. § 1370. Congress's intent in excluding § 1370 from § 1377(e) is unclear and ambiguous. We decline to read § 1377 as incorporating § 1370 because it was not explicitly included in § 1377(e), as other sections are.

■ The EPA, however, also construes § 1370 as a savings clause that merely recognizes powers already held by the states. 56 Fed.Reg. 64,886 (1991). Thus, Congress's failure to incorporate § 1370 into § 1377 does not prevent Indian tribes from exercising their inherent sovereign power to impose standards or limits that are more stringent than those imposed by the federal government. Indian tribes have residual sovereign powers that already guarantee the powers enumerated in § 1370, absent an express statutory elimination of those powers.[12] In *Arkansas*, the Court explained that § 1370 "only concerns *state* authority and does not constrain the *EPA's* authority," 503 U.S. at 107, 112 S.Ct. at 1057 (emphasis in original); likewise, we do not view § 1370 as implicitly constraining tribes' sovereign authority. We conclude that the EPA's construction of the 1987 amendment to the Clean Water Act—that tribes may establish water quality standards that are more stringent than those imposed by the federal government—is permissible because it is in accord with powers inherent in Indian tribal sovereignty.

■ In the second question at issue, Albuquerque argues that § 1377 does not expressly permit Indian tribes to enforce effluent limitations or standards under § 1311 to upstream point source dischargers outside of tribal boundaries. Albuquerque misconstrues the Clean Water Act by selectively reading isolated sections; the Clean Water Act is a comprehensive regulatory scheme, and it must be read as such. The express incorporation in § 1377(e) of §§ 1341 and 1342 gives the EPA the authority to issue NPDES permits in compliance with a tribe's

---

9. Section 1251(g) generally preserves the authority of states to regulate water within their jurisdiction. Together, §§ 1377 and 1251(g) preserve the authority of Indian tribes—acting as states—to regulate water within their jurisdiction.

10. Appellant's App. at 966 (Letter from the EPA to the Pueblo of Isleta (Dec. 24, 1992)).

11. Section 1370 provides:
 Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent stan-

dard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.
33 U.S.C. § 1370.

12. *See, e.g., United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). For example, Indian tribes could use their water rights, which are an element of tribal sovereignty, to assert an action against upstream polluters or to recover damages for groundwater contamination. *See* Comment, *Indian Reserved Water Rights Doctrine and the Groundwater Question*, 19 Am. Indian L.Rev. 403, 441 n. 297 (1994).

water quality standards.[13] Section 1341 authorizes states to establish NPDES programs with the EPA, and § 1342 authorizes the EPA to issue NPDES permits in compliance with downstream state's water quality standards. *See Arkansas*, 503 U.S. at 102, 107, 112 S.Ct. at 1054–55, 1057 (construing §§ 1341 and 1342 as giving the EPA authority to require an upstream NPDES discharger to comply with downstream state water quality standards). Under the statutory and regulatory scheme, tribes are not applying or enforcing their water quality standards beyond reservation boundaries.[14] Instead, it is the EPA which is exercising its own authority in issuing NPDES permits in compliance with downstream state and tribal water quality standards. In regard to this question, therefore, the 1987 amendment to the Clean Water Act clearly and unambiguously provides tribes the authority to establish NPDES programs in conjunction with the EPA. Under §§ 1311, 1341, 1342 and 1377, the EPA has the authority to require upstream NPDES dischargers, such as Albuquerque, to comply with downstream tribal standards.

### IV. APA's Notice and Comment Requirements Under the Clean Water Act's Regulatory Scheme

 Albuquerque next claims that the EPA failed to comply with the procedural requirements of the Administrative Procedure Act [APA] in approving the Isleta Pueblo's water quality standards. 5 U.S.C. §§ 551–559, 701–706. Under the APA, we review agency action de novo to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is a narrow one, and we are not empowered to substitute our judg-ment for that of the EPA. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

Albuquerque asserts that the EPA was engaged in informal rulemaking when it approved the Isleta Pueblo's standards, and, therefore, it claims that the EPA violated § 553 of the APA by failing to include a statement of basis and purpose for its action approving the Pueblo standards and by failing to provide for public notice and comment. *See* 5 U.S.C. § 553. Albuquerque urges us to set aside the EPA's approval of the Isleta Pueblo standards because of the EPA's failure to comply with procedures mandated by law. *See* 5 U.S.C. § 706(2)(D).

The intent of Congress expressed in the Clean Water Act, however, was to require states or tribes to provide for public participation in the adoption of water quality standards. Section 1313(c)(1) provides:

> The Governor of a State or the State water pollution control agency of such State shall from time to time (but at least once each three year period … ) hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards. Results of such review shall be made available to the Administrator.

33 U.S.C. § 1313(c)(1). Under the water quality standards provisions of the Clean Water Act, it is the states and tribes which conduct rulemaking proceedings.[15] This is in accord with Congress's intent to preserve a primary role for the states and tribes in eliminating water pollution. The results of state and tribal rulemaking proceedings are then presented to the EPA for approval. The Fourth Circuit has explained the EPA's

---

**13.** While § 1377 incorporates § 1342, § 1342 incorporates § 1311 and thereby provides the EPA the authority to issue NPDES permits to upstream point source dischargers which are in compliance with downstream state's and tribe's water quality standards.

**14.** Although, Indian tribes could have inherent jurisdiction over non-Indian conduct or non-Indian resources if there is "some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v.*

*United States*, 450 U.S. 544, 566, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981) (citations omitted).

**15.** In contrast, Congress requires the EPA to conduct notice and comment rulemaking procedures when it promulgates federal water quality standards. 33 U.S.C. § 1313(c)(4). Section 1313 makes a clear distinction between the procedures required for approval of state standards and rulemaking to promulgate federal standards.

limited role in reviewing water quality standards proposed by states, stating:

> EPA sits in a reviewing capacity of the state-implemented standards, with approval and rejection powers only....
>
> ....
>
> *[S]tates* have the primary role, under § 303 of the CWA (33 U.S.C. § 1313), in establishing water quality standards. EPA's sole function, in this respect, is to review those standards for approval.

*Natural Resources Defense Council v. EPA,* 16 F.3d 1395, 1399, 1401 (4th Cir.1993) (emphasis in original) (citation omitted). Congress clearly intended the EPA to have a limited, non-rulemaking role in the establishment of water quality standards by states and tribes, and, consequently, no statement of basis or purpose for its actions was necessary.

Additionally, Congress provided the EPA sixty days for approval and ninety days for disapproval of water quality standards proposed by states and tribes. 33 U.S.C. § 1313(c)(3). Congress could not reasonably expect the EPA to conduct APA notice and comment rulemaking proceedings within sixty or ninety days. Thus, the time restriction for the EPA's review of state and tribal water quality standards supports our conclusion that Congress intended the EPA to have a very limited role and did not intend EPA to engage in informal rulemaking.

More important, however, public participation in the establishment of water quality standards occurs when states and tribes review or revise water quality standards. *See* 33 U.S.C. § 1313(c)(1) (requiring states to hold public hearings when reviewing or revising water quality standards). All comments submitted to a state or tribe during the comment period become part of the administrative record and are reviewed by the EPA in determining whether to approve the state's or tribe's proposed standards. Consequently, the purpose of public notice and comment under the APA is satisfied under the Clean Water Act without requiring the EPA to receive additional comments. The State of New Mexico has commented on the effectiveness of Congress's approach in the Clean Water Act and the potentially negative impact of Albuquerque's proposed approach:

> The Clean Water Act's approach, therefore, is to place the primary responsibility on states to adopt and implement their own water quality standards provided only that they cannot be *less* stringent than the Act requires. Nothing in the Act evidences any intent that EPA involve itself in the details or substance of the process, except only to make sure that the states have complied with the Act. Nor does the Act indicate any intent that EPA duplicate the hearing, notice, and comment process conducted by the State. To the contrary, the short time periods given to EPA imply the opposite, since full notice and comment procedures generally take many months. Indeed, the State of New Mexico's most recent triennial review, with its notice, comment, and hearing process, took more than a year to be completed.
>
> Not only would the expansive EPA review of the tribal water quality standards sought by the City duplicate the lengthy process already undertaken by the tribe itself in adopting the standards, it is doubly unnecessary because of the notice, comment, and hearing process entailed in issuance of NPDES permits. As it was, there was full opportunity for notice, comment and hearing both for adoption of the Isleta standards (conducted by the Pueblo) and for issuance of the City's NPDES permit (conducted by EPA). To require yet another detailed notice, comment and hearing process by EPA would be to inject more bureaucracy, delay and expense into an already lengthy process that allows ample opportunity for public input.

Brief of Amici Curiae New Mexico Environment Department and State of New Mexico *ex rel.* Tom Udall, at 10–11. We conclude that the notice and comment requirements of the APA are satisfied by the Clean Water Act's procedural scheme and that the EPA has reasonably implemented the Act's procedural requirements.

■ In this case, the Isleta Pueblo gave public notice and provided for a comment period in establishing its proposed water quality standards. On June 8–11, 1991, the

Isleta Pueblo published a notice of a public hearing on its proposed standards in the Albuquerque Journal, as required by 33 U.S.C. § 1313(c)(1). The Isleta Pueblo also mailed notice of the hearing to potentially interested parties, including the City of Albuquerque. The Isleta Pueblo held a public hearing on August 7, 1991. Later, an additional opportunity for notice, comment, and hearing was provided by the EPA in issuing Albuquerque's NPDES permit. Thus, a full and fair opportunity for public notice, comment, and hearing was provided in this case in accordance with the APA and the Clean Water Act.

## V. The Rational Basis of the EPA's Approval of Isleta Pueblo's Standards

Albuquerque also claims that the EPA's approval of the Isleta Pueblo standards was unsupported by a rational basis on the record and was therefore arbitrary and capricious. Albuquerque argues that the EPA was required to reject the Isleta Pueblo's water quality standards unless the EPA had established its own record based on a sound scientific rationale for each particular provision.[16]

The EPA, however, reviews proposed water quality standards only to determine whether they are stringent enough to comply with the EPA's recommended standards and criteria. If the proposed standards are more stringent than necessary to comply with the Clean Water Act's requirements, the EPA may approve the standards without reviewing the scientific support for the standards. Whether the more stringent standard is attainable is a matter for the EPA to consider in its discretion; sections 1341 and 1342 of the Clean Water Act permit the EPA and states to force technological advancement to attain higher water quality. *See United States Steel Corp. v. Train,* 556 F.2d 822, 838 (7th Cir.1977); *Homestake Mining Co. v. EPA,* 477 F.Supp. 1279, 1283

(D.S.D.1979). The EPA's letter approving the Isleta Pueblo standards explains that it is approving the standards, despite their departure from the EPA's guidelines, based on the Tribe's authority to adopt standards more stringent than the minimum requirements of the Clean Water Act.[17]

The EPA considered Isleta Pueblo's rationale for each of the standards challenged by Albuquerque, and the tribe's record contains detailed responses to all of the criticisms expressed by the EPA and Albuquerque. The record contains a detailed explanation of the Isleta Pueblo's scientific, technical, and policy reasons for choosing to establish more stringent standards. For example, the Isleta Pueblo stated that stringent standards are justified because of prevailing drought conditions and the need to protect sensitive subpopulations. The EPA concluded that the standards were consistent with the Clean Water Act's requirements and should therefore be approved. The arbitrary and capricious review standard is very deferential; "an agency ruling is 'arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem.'" *Arkansas,* 503 U.S. at 113, 112 S.Ct. at 1060 (citation omitted). Albuquerque has not shown that the EPA failed to consider an important aspect of the Isleta Pueblo's water quality standards.

Additionally, the essence of Albuquerque's complaint is with the policy choice of Congress and the EPA to afford states and tribes the ability to force the development of technology through more stringent water quality standards. "It is not our role ... to decide which policy choice is the better one, for it is clear that Congress has entrusted such decisions to the Environmental Protection Agency." *Arkansas,* 503 U.S. at 114, 112 S.Ct. at 1061.

16. Albuquerque has repeatedly complained that the Isleta Pueblo standards are unattainable, totally irrational, and would place excessive economic burdens on the City. These complaints are belied by the NPDES permit settlement which applies the Isleta Pueblo standards to Albuquerque. Presumably, Albuquerque would not have agreed to the NPDES permit settlement if the water quality standards placed impossible demands on it.

17. Appellant's App. at 966 (Letter from the EPA to the Pueblo of Isleta (Dec. 24, 1992)). See our discussion of the Tribe's authority to adopt standards more stringent than the minimum required by the Clean Water Act, *infra* Part III.

In its next claim, Albuquerque argues that the Isleta Pueblo criteria approved by the EPA are not stringent enough to protect the Tribe's designated use standard described as primary contact ceremonial use. The Tribe describes primary contact ceremonial use as involving the "immersion and intentional or incidental ingestion of water." Albuquerque argues that this requires the river water quality to meet the standards of the Safe Drinking Water Act, 42 U.S.C. § 300f, and the Isleta Pueblo's water quality criteria approved by the EPA fail to protect water used under the ceremonial use standard.

■ As the district court stated:

This argument seems far-fetched. The primary contact ceremonial use appears to resemble a fishable/swimmable standard, which assumes the ingestion of some water, more than it resembles a safe drinking water standard, which assumes the ingestion of a volume of water daily.

*Albuquerque*, 865 F.Supp. at 740. The federal drinking water standards apply only to a "public water system," which is defined as a system supplying piped water for human consumption serving at least twenty-five persons or having at least fifteen service connections. 42 U.S.C. § 300f(4). The Isleta Pueblo's ceremonial use standard does not convert the Rio Grande River into a public water system. The EPA considered and approved this aspect of the Isleta Pueblo water quality standards. We decline to second-guess the EPA's technical determination, which is entitled to substantial deference, that the Isleta Pueblo's water quality criteria adequately protect its ceremonial designated use standard.

## VI. The EPA's Dispute Resolution Process

The 1987 amendment directs the EPA Administrator to establish "a mechanism for the resolution of any unreasonable consequences that may arise as a result of differing water quality standards that may be set by states and Indian tribes located on common bodies of water." 33 U.S.C. § 1377(e). In response to this directive, the EPA adopted regulations providing for mediation or arbitration to resolve disputes over unreasonable conse-

quences of tribal water quality standards. *See* 40 C.F.R. 131.7. In developing the regulations, the EPA considered whether, in addition to the state and the tribe, affected parties should be involved in the resolution process, and determined that such parties could be invited to participate. The EPA regulations, however, permit only states and tribes to initiate the resolution process because they are the entities authorized to revise or modify the water quality standards in dispute.

■ Albuquerque argues that the EPA's dispute resolution mechanism fails to meet the statutory requirement because it deprives interested third parties from initiating the process and because its reliance on mediation and non-binding arbitration is inadequate to resolve such disputes. Section 1377(e) does not specify how or by whom the dispute resolution mechanism shall be initiated. Rather, § 1377(e) is worded to give the EPA Administrator broad discretion in establishing the dispute resolution process. The EPA's decision to use mediation and non-binding arbitration is consistent with the Clean Water Act's requirement that the EPA encourage cooperative activities by the states. 33 U.S.C. § 1253(a). The need for a dispute resolution mechanism to resolve unreasonable consequences stems from the possibility that two sovereigns—a state and a tribe—may impose different water quality standards on a common body of water. It is reasonable, therefore, to allow only those two sovereigns to initiate the dispute resolution process to resolve their differences rather than to include affected permittees such as Albuquerque. As successfully occurred through the negotiated settlement in this case, the dispute resolution mechanism allows the state and tribe to invite third parties to participate. Courts reviewing an agency action should afford "the EPA's interpretation of the governing law an appropriate level of deference." *Arkansas*, 503 U.S. at 112, 112 S.Ct. at 1060 (citing *Chevron*, 467 U.S. at 842–44, 104 S.Ct. at 2781–83). The EPA's establishment of a dispute resolution mechanism that relies on tribal and state cooperation to address unreasonable consequences

was a reasonable interpretation of § 1377(e) and is entitled to deference.

## VII. The Tribe's Ceremonial Usage and the Establishment Clause

Albuquerque next claims that the EPA's approval of the Pueblo's ceremonial use designation offends the Establishment Clause of the First Amendment. The First Amendment provides in relevant part: "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. Government action does not violate the Establishment Clause if "[t]he challenged governmental action has a secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion." *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 395, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971)).[18]

The EPA approved Isleta Pueblo's promulgation of "Primary Contact Ceremonial Use" as a designated use of the Rio Grande River within the boundaries of the Indian reservation. The tribe defines "Primary Contact Ceremonial Use" as "the use of a stream, reach, lake, or impoundment for religious or traditional purposes by members of the PUEBLO OF ISLETA; such use involves immersion and intentional or incidental ingestion of water."[19] Appellant's App. at 1254. Albuquerque argues that the EPA's approval of this standard violates all three aspects of the Establishment Clause under *Lemon*.

First, Albuquerque argues that the reason for the designated use is explicitly sectarian. The secular purpose requirement does not mean that a law's purpose must be unrelated to religion because that would require "'that the government show a callous indifference to religious groups,' ... and the Establishment Clause has never been so interpreted." *Corporation of Presiding Bishop of Church of Jesus Christ of Latter–day Saints v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987) (citation omitted). The EPA's approval of the primary contact ceremonial use designation serves a clear secular purpose: promotion of the goals of the Clean Water Act. The EPA's purpose in approving the designated use is unrelated to the Isleta Pueblo's religious reason for establishing it. The Isleta Pueblo's designation of a ceremonial use does not invalidate the EPA's overall secular goal.

Second, Albuquerque claims that the EPA's action has a primary effect of advancing religion. We disagree. The EPA is not advancing religion through its own actions, and it is not promoting the Isleta Pueblo's religion. The primary effect of the EPA's action is to advance the goals of the Clean Water Act.

Third, Albuquerque asserts the designated use results in excessive governmental entanglement with religion because the Pueblo and the EPA must inquire on an ongoing basis whether the standards adequately protect religious uses of the river water. This argument is meritless. "There is no genuine nexus between" the EPA's approval of the ceremonial use standard "and establishment of religion," *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 675, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697 (1970), and the EPA's approval of the standard provides only an incidental benefit to religion. *See Lamb's Chapel*, 508 U.S. at 395, 113 S.Ct. at 2148.[20] The EPA's approval of the ceremonial use standard does not require any governmental

18. In *Lamb's Chapel* the Court notes that the continued validity of *Lemon* has come into question, but it "has not been overruled." 508 U.S. at 395 n. 7, 113 S.Ct. at 2148 n. 7.

19. It is noteworthy that the ceremonial use encompasses water used for either religious or traditional purposes.

20. If anything, the agency's approval furthers the free exercise of religion, consistent with the policy expressed in the American Indian Religious Freedom Act. *See* 42 U.S.C. § 1996 (Supp.1994) ("[I]t shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, ... including but not limited to ... the freedom to worship through ceremonials and traditional rites.").

involvement in the Isleta Pueblo's religious practices. Excessive governmental entanglement will not result when the EPA incorporates the Isleta Pueblo's water quality standards in issuing future NPDES permits.

 The district court correctly rejected Albuquerque's Establishment Clause claim.

## VIII. Isleta Pueblo's Standards and Vagueness

 Albuquerque asserts that the Isleta Pueblo's standards were so vague as to deprive Albuquerque of due process. We will not declare a regulation unconstitutionally vague if it puts the regulated party on notice as to what conduct is required. *See Komjathy v. National Transp. Safety Bd.*, 832 F.2d 1294, 1297 (D.C.Cir.1987), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988); *Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1387 (D.C.Cir.1985). There is a strong presumption that regulations are not unconstitutionally vague if the regulated party has the means of obtaining clarification either by making inquiry or through an administrative process. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).

 Albuquerque complains that the Isleta Pueblo standards use unconstitutionally vague narrative terms, such as " '*objectionable* ... floating materials,' '[c]ontaminants [which] ... impart *unpalatable* flavor to fish,' 'nutrients [which] produce *objectionable* algal densities,' 'waters [which are] ... *virtually free* of pathogens,' and 'turbidity [which] causes an *unaesthetic and substantial* visible contrast.'" Appellant's Br. at 48–49 (alterations, emphasis, and omissions in original). Albuquerque appears to misunderstand the process established by the EPA under the Clean Water Act. The EPA regulations allow water quality standards, such as the Isleta Pueblo standards, to be narrative descriptions. 40 C.F.R. § 131.11 (1995). These standards, however, do not require any particular conduct by Albuquerque; instead, Albuquerque is on notice that its revised NPDES permit may contain the specific standards which must be satisfied. Plaintiff's claim of vagueness is without merit because an administrative procedure is in place through which it will have notice of the specific enforceable standards that it must meet.

## IX. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Plaintiff's motion for summary judgment and its granting of Defendant's motion for summary judgment.

AFFIRMED.

