**Paul S. HUDSON and Aviation Consumer Action Project, Petitioners,**

v.

**FEDERAL AVIATION ADMINISTRATION, Respondent.**

**No. 98–1295.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1999.

Decided Oct. 8, 1999.

Rehearing En Banc Denied Dec. 8, 1999.*

---

* Circuit Judge Henderson did not participate in this matter.

Nicholas H. Cobbs argued the cause for petitioners. With him on the briefs was Nicholas Gilman.

Bruce G. Forrest, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Robert S. Greenspan, Attorney, and Kenneth G. Caplan, Federal Aviation Administration.

Sherilyn Peterson argued the cause for amicus curiae The Boeing Company. With her on the brief was Kirstin S. Dodge.

Before: WALD, SILBERMAN, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioners claim that respondent Federal Aviation Administration violated the Administrative Procedure Act by issuing a purported policy statement without notice and comment rulemaking and that the FAA's issuance of a "type certificate" for the Boeing 777–300 pursuant to the newly adopted policy was an abuse of discretion. We conclude that notice and comment rulemaking was not required nor was the issuance of the type certificate illegal.

## I.

The administrator of the FAA is responsible for prescribing the minimum standards required in the interest of safety for the design of aircraft, and may establish tests to ensure compliance with the standards. *See* 49 U.S.C. § 44701 *et seq.* If the administrator is satisfied that the design of an aircraft meets these standards, the FAA issues the manufacturer a so-called type certificate allowing it to begin production of such aircraft.

The FAA has promulgated a rule with respect to emergency evacuation of aircraft that requires manufacturers to demonstrate that:

> For airplanes having a seating capacity of more than 44 passengers ... the maximum seating capacity, including the number of crewmembers required ... can be evacuated from the airplane to the ground under simulated emergency conditions within ninety seconds. Compliance with this requirement must be shown by actual demonstration ... *unless* the Administrator finds that a combination of analysis and testing will provide data equivalent to that which would be obtained by actual demonstration.

14 C.F.R. § 25.803(c) (emphasis added).

The regulation as originally promulgated in 1967 required an actual demonstration when the design of an aircraft was altered to allow a passenger capacity increase of greater than five percent. In 1978, the regulation was amended to eliminate the five-percent provision, so that it assumed its current, discretionary, form. Then in 1989, the FAA released an "advisory circular" that again called for demonstrations if the five-percent benchmark was reached. *See* Advisory Circular 25.803–1, 55 Fed. Reg. 4,934 (Feb. 12, 1990).[1] But the circular cautioned that it "provides guidance on a means, but not the only means, of compliance with the Federal Aviation Regulations" concerning emergency evacuations, *id.* at 1, and it stated only that "a full-scale demonstration *should* be conducted when ... [t]he proposed passenger seating configuration is an increase of more than five percent above that which has been previously demonstrated on an airplane ... with an identical ... exit configuration." *Id.* at 4 (emphasis added).

This case arises from the FAA's change in its position in 1998, following a reconsideration of the use of full-scale demonstrations sparked by injuries among demonstration participants. On March 17 of that year, the FAA issued a new policy statement—ANM–98–2—which announced that:

> The FAA has now determined that standardized methodologies have been developed and there are sufficient data now available, such that a limitation on the use of analysis based only on an increase in passenger capacity is no longer necessary.... The FAA has determined that ... where sufficient data are available, analysis is an option.... Full-scale demonstrations will still be required when sufficient data are not available to support a combination of analysis and test [sic].

*See* 63 Fed.Reg. 13,095, 13,096 (March 17, 1998).

Besides altering the agency's general policy by allowing manufacturers to demonstrate compliance with the regulation through analysis *whatever* the percentage increase in seating capacity, the statement also foreshadowed the FAA's decision to act in accordance with this policy in two pending certification applications:

> It is the FAA position that for the Boeing 777–300 and the Airbus A330/340, there are currently sufficient evacuation data available to support analysis.... In both these cases, a wealth of full-scale evacuation data are available to support analysis and the FAA is confident that the use of analysis is well within the intent of the regulation. Therefore, in accordance with the regulation, conduct of additional full-scale evacuation demonstrations is not required to demonstrate compliance, if a satisfactory analysis is produced.

*Id.*

In a rather unorthodox manner the policy statement also invited public comment, stating that "[r]esolution of the public comment will be considered in determining whether the policy should be refined for

---

1. An FAA advisory circular is akin to a policy statement. *See* Brief of *Amicus Curiae* Boeing Co. at addendum 7.

future projects, and so reflected in [a new] advisory circular." *Id.* at 13,095–96. The FAA received 23 responses prior to May, several of which were critical of the FAA's decision to allow analysis in lieu of full-scale demonstrations.

Boeing transmitted to the FAA its evacuation analysis for the 777–300, and the FAA informed Boeing that the analysis demonstrated compliance with 14 C.F.R. § 25.803. The FAA consequently on May 4, 1998, issued Boeing a type certificate for the 777–300. It simply states that "[t]his certificate ... certifies that the type design ... meets the airworthiness requirements of Part 25 of the Federal Aviation Regulations."

Petitioners, who represent an international group of air travelers, airline pilots, and flight attendants, filed this petition for review. They allege that policy statement ANM–98–2 could not be adopted by the FAA without the agency undertaking notice and comment rulemaking, and, in any event, issuance of the 777–300 type certificate was an abuse of discretion because the FAA failed to explain both its underlying change in policy and the reasons 777–300 type certification complied with regulatory standards. The FAA counters that petitioners cannot challenge the policy statement since it was issued more than 60 days before petitioners filed their petition, *see* 49 U.S.C. § 46110(a), and defends its substantive decision to issue Boeing a type certificate for the 777–300.

## II.

■ As noted, petitioners' main challenge is an APA procedural one—that the FAA's policy statement was in effect a regulatory amendment that had to be preceded, not followed, by a notice and comment procedure. *See* 5 U.S.C. §§ 551(5),

553(b)-(c); *National Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan,* 979 F.2d 227, 240 (D.C.Cir.1992). The government, although tacitly admitting that the reasoning used in the new policy statement explains the subsequent administrative action (which was an informal adjudication) and is therefore a legitimate target of petitioners' attack, contends that the procedural claim comes too late—that it had to be raised within 60 days of the issuance of the policy statement.

The difficulty with the government's argument inheres in the peculiar position any petitioner is in when he or she claims that an ostensible policy statement is in actuality a regulation. A pure policy statement under the APA, as we have often explained, is not an attempt to make substantive law. *See, e.g., Pacific Gas & Elec. Co. v. Federal Power Comm'n,* 506 F.2d 33, 38 (D.C.Cir.1974). It is only supposed to indicate an agency's inclination or leaning, not in any way binding on the agency. *See United States Tel. Ass'n v. FCC,* 28 F.3d 1232, 1234 (D.C.Cir.1994). Sometimes, to be sure, the purported policy statement on its face carries the character of a substantive regulation, *see, e.g., Better Gov't Ass'n v. Department of State,* 780 F.2d 86 (D.C.Cir.1986), but more often it will not and will only reveal itself as something more than a policy statement when the agency subsequently relies on it as if it were binding *law.*[2] If a petitioner could not challenge the issuance of the policy statement at that point, because it was too late to bring the procedural challenge, a loophole in the APA's notice and comment requirements would be created.

Accordingly, we have often held that an early procedural challenge to a purported policy statement is not ripe because it is not yet demonstrable that the agency intends to treat it as having the characteris-

---

2. We have not considered whether that analysis applies to a subsequent informal adjudication which does not call for an adversary procedure, in which case we would not see an agency refusing to consider arguments that challenged the policy statement. It may well

be that in these circumstances a reliance on the policy statement would not necessarily convert the statement into a *de facto* rule. We can avoid this question here because the policy statement and informal adjudications are so interconnected.

tics of a rule. *See, e.g., Public Citizen, Inc. v. Nuclear Regulatory Comm'n,* 940 F.2d 679, 681–83 (D.C.Cir.1991); *Natural Resources Defense Council, Inc. v. EPA,* 859 F.2d 156, 191 (D.C.Cir.1988).[3] Typically the *substance* of a true policy statement could not be contested then either because it would be regarded as not ripe until it was reflected in subsequent agency actions (indeed, theoretically a pure policy statement might not even be final agency action). *See Pacific Gas & Elec.,* 506 F.2d at 45, 48–49. It seems to us that as a practical matter a procedural challenge to a policy statement, claiming it to be a *de facto* rule, cannot be brought until a substantive challenge to the policy would be ripe. *Cf. Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1204–05 (D.C.Cir.1998). In this case the policy statement indicated that the agency was taking a different approach to be applied first in the upcoming Boeing certification. As such, the policy statement not only signaled a general shift; it discussed two specific cases that were about to be decided. It would have been somewhat artificial then to review the policy statement independent of those decisions. Accordingly, we would likely have regarded petitioners' APA challenge as premature if it had been brought before the issuance of the certificate, and so we do not agree that petitioners' subsequent challenge is too late. *See id.* at 1204.

■ Turning then to petitioners' procedural challenge, we do not agree that the FAA was obliged to follow APA notice and comment procedures prior to issuance of ANM–98–2. It appears on its face to be just a policy statement. It limits itself to situations "where sufficient data *are* available," states only that "analysis in such cases *may* be acceptable," and cautions that "[f]ull-scale demonstrations *will still*

be required when sufficient data *are not* available to support a combination of analysis and test [sic]." 63 Fed.Reg. at 13,096 (emphasis added). Moreover, as noted, it calls for public comments on the policy, and indicates that there will be a determination of whether "the policy should be refined for future projects." *Id.* With respect to the 777–300, it states that the type certificate will be approved only "if a satisfactory analysis is produced." *Id.* Since the statement does not cabin agency discretion, even as to the 777–300, it has the characteristics of a policy statement. *See Pacific Gas & Elec.,* 506 F.2d at 38–39; *see also Chamber of Commerce v. Department of Labor,* 174 F.3d 206, 212 (D.C.Cir.1999). To be sure, the government relies on the reasoning expressed in the policy statement to support its subsequent administrative decision, but that is not surprising because the policy statement, as we noted, came only a short time before the decision and explicitly contemplated the decision. Furthermore, although the statement purported to abandon the prior practice whereby the agency invariably required a demonstration if the five-percent threshold was reached, nothing prevented the agency from changing its enforcement policy again without notice, or requiring a full demonstration for the 777–300.

Petitioners argue that notice and comment rulemaking was nonetheless required because ANM–98–2 is actually an interpretation of the governing regulation that is at variance with the FAA's prior "interpretation" embodied in the 1989 advisory circular. They rely on *Alaska Professional Hunters Ass'n, Inc. v. FAA,* 177 F.3d 1030 (D.C.Cir.1999), and *Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579 (D.C.Cir.1997). In these cases, we said that "[o]nce an agency gives its regulation an interpretation, it can only change that

---

3. A rule of agency procedure, by contrast, will typically be ripe on a facial challenge. *See JEM Broadcasting Co., Inc. v. FCC,* 22 F.3d 320 (D.C.Cir.1994). But we think the government's alternative argument that its statement was a procedural rule is a non-starter. It is

not a "rule," *see Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C.Cir.1997), and it is not directed to agency procedure but rather the substantive showing the airline manufacturer must produce. *See JEM Broadcasting,* 22 F.3d at 327–28.

interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans*, 117 F.3d at 586. The instant case, however, does not fit within the *Paralyzed Veterans/Alaska Professional Hunters* line for the simple reason that it does not involve an *interpretation* of a regulation. As we stated in *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C.Cir.1997), "[I]nterpretative rules and policy statements are quite different agency instruments. An agency policy statement does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm." Although petitioners argue that *Alaska Professional Hunters* is pertinent because it, like this case, involved a long-term agency practice which constituted an implicit interpretation or application of the relevant regulation, that is not so. In that case, a formal adjudication by an associate agency had adopted an interpretation of the regulation in accord with the informal practice. *See Alaska Professional Hunters*, 177 F.3d at 1031.

In the instant case there is no dispute as to the regulation's meaning. The regulation states that where the Administrator finds that a combination of analysis and testing provides data equivalent to an actual evacuation, the former may be used in place of the latter. Whether this test is met requires a factual determination by the FAA, and clearly, as methods of analysis and other considerations develop over time, the FAA's response to the test can also. In 1989 the FAA did not believe that analysis would provide equivalent data when seating capacity changed by over five percent, but in 1998, spurred on by injuries to demonstration participants, it reviewed its policy and concluded that the situation had changed such that analysis and testing were now sufficient. *See* 63

Fed.Reg. at 13,096 ("The FAA has now determined that standardized methodologies *have been* developed and there are sufficient data *now* available" (emphasis added)). This is not a different interpretation of the regulation, just an application of the regulation to a changed situation which calls for a different policy.

## III.

◼ Petitioners alternatively argue that the FAA was at least obliged to give a fuller explanation for the switch of position that led to the issuance of the certificate—one that took into account the adverse comments submitted in response to the policy statement. The agency was not, however, required to seek comments on its policy statement nor its pending certificate decision. The APA includes no such requirement and we are not at liberty to create one. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 653–55, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). A policy statement can be issued at any time without a comment period and the certificate is merely an administrative action, a so-called informal adjudication, for which an agency is only obliged to provide an explanation adequate to give a reviewing court a basic understanding—and not a very detailed one—of its action. *See Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). In this case the policy statement—and the explanation provided in the government's brief[4] combined with Boeing's submission—easily meets that standard. The agency decided that a full-scale demonstration created too great a risk of injury to the demonstrators and this spurred an examination of the use of analysis. The administrator concluded that, in

4. Since an agency engaged in informal adjudication is not obliged to give much of an explanation before a petition for review, *cf. Pension Benefit Guar.*, 496 U.S. at 655–56, 110 S.Ct. 2668, we tend to look to its brief for fuller explanation of its action. *See, e.g., Guardian Moving & Storage Co., Inc. v. ICC*, 952 F.2d 1428, 1432–33 (D.C.Cir.1992).

particular cases, testing and analysis would provide equivalent data to an actual demonstration even if the capacity increase were greater than five percent, and also found that such was the case for the 777–300. That some "commentators"—whether or not their views should be considered part of the record[5]—disagreed with the FAA's policy shift is of no moment. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.")

Petitioners do not really claim that the FAA's position was arbitrary and capricious, only that its failure to respond to the comments and give a fuller explanation is illegal. For the reasons we have given, we think petitioners are wrong. The petition for review is denied.

5. The parties dispute whether those comments should be regarded as part of the record in the informal adjudications. We need not decide that issue.