**TORCH OPERATING COMPANY,**
Plaintiff

v.

**Bruce BABBITT, et al., Defendants.**

**Chevron U.S.A. Inc., et al., Plaintiffs**

v.

**Bruce Babbitt, et al., Defendants**

**Union Oil Company of Calif., Plaintiff**

v.

**Bruce Babbitt, et al., Defendants**

**Amerada Hess Corp., et al., Plaintiffs**

v.

**Bruce Babbitt, et al., Defendants**

**BP Exploration & Oil Inc., Plaintiff**

v.

**Bruce Babbitt, et al., Defendants.**

No. CIV.A. 98–884(EGS), CIV.A. 98–1388(EGS), CIV.A. 98–1398(EGS), CIV.A. 98–1444(EGS), CIV.A. 98–2125(EGS).

United States District Court,
District of Columbia.

Oct. 24, 2001.

Albert B. Krachman, Esquire, Bracewell & Patterson, L.L.P., Washington, DC, for Torch Operating Co.

E. Edward Bruce, Esquire, Thomas Leon Cubbage, III, Covington & Burling, Washington, DC, for Chevron Corp., Exxon Corp., Texaco Exploration and Production Inc. and Mobil Exploration and Producing U.S. Inc.

John K. McDonald, Esquire, Jackson & Kelly, Washington, DC, for Pennzoil Exploration and Production Co.

William F. Demarest, Jr., Esquire, D. Edward Wilson, Jr., Shook, Hardy & Bacon, L.L.P., Washington, DC, Robert E. Holden, Esquire, Liskow & Lewis, New Orleans, LA, for BP Exploration & Oil Inc. and Union Oil.

Geoffrey Garver, Lori Caramanian, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for Bruce Babbitt, Bob Armstrong, Deborah Tschudy-Gibbs, Cynthia L. Quaterman, and Minerals Management Service.

Martin LaLonde, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for U.S.

Thad Stevenson Huffman, John K. McDonald, Jackson & Kelly, PLLC, Washington, DC, for Amerada Hess Corporation.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiffs [1] lease from the federal government the right to produce oil and gas located offshore of Louisiana and California on the Outer Continental Shelf ("OCS"). Plaintiffs transport the oil to shore through pipelines located on the OCS. Defendant Department of the Interior ("DOI") issues and administers OCS oil and gas leases under the OCS Lands Act, 43 U.S.C. § 1331, *et seq.* ("OCSLA"). Pursuant to the OCSLA, lessees are required to pay royalties on their crude oil production on the OCS to the United States. The Minerals Management Service ("MMS"), a subdivision of DOI, promulgates royalty regulations, and collects, checks, and distributes revenues from the OCS gas leases. This action arises out of plaintiffs' challenge to defendants' final decision involving the application of DOI's royalty valuation regulations to plaintiffs. Plaintiffs challenge DOI's action denying them a particular exception contained in the royalty calculation regulations as arbitrary and capricious in violation of the Administrative Procedures Act (APA), 5 U.S.C. § 553 and § 706(A)(2).

Pending before the Court are the parties' cross-motions for summary judgment. Upon consideration of the parties' motions, the responses and replies thereto, plaintiffs' supplemental submission of new authority, the responses and replies thereto, counsels' representations at oral argument, as well as the applicable statutory and case law, this Court concludes that plaintiffs' motion for summary judgment [42–1] should be **GRANTED,** and defendants' motion for summary judgment [45–1] should be **DENIED.**

### Background

### I. Statutory and Regulatory Framework

In January 1988, through the APA's notice and comment rule-making procedures, MMS issued comprehensive rules relating to the calculation of royalties on crude oil production from federal leases. *See Revision of Oil Product Valuation Regulations and Related Topics,* 53 Fed.Reg. 1184–1227 (Jan. 15, 1988). The regulation at the center of the present controversy explains how lessees calculate the transportation cost allowances that they may deduct from their royalty calculations. 30 C.F.R. § 206.105 (1998).

MMS's royalty valuation rules allow certain deductions. Under MMS's royalty valuation rules, a lessee shipping oil may

---

1. The plaintiffs in this consolidated proceeding are Torch Operating Co. (Torch), plaintiff in No. 98–884; Chevron U.S.A. Inc. (Chevron), Exxon Corp. (Exxon), Mobil Exploration & Producing U.S. Inc. (Mobil), and Texaco Exploration and Production, Inc. (Texaco), plaintiffs in No. 98–1388; Union Oil Company of California (Unocal), plaintiff in No. 98– 1398; Amerada Hess Corp. (Amerada Hess) and PennzEnergy Exploration and Production, L.L.C. (PennzEnergy), as successor in interest to Pennzoil Exploration and Production Co., plaintiffs in No. 98–1444, and BP Exploration & Oil, Inc. (BPX), plaintiff in No. 98–2125.

deduct the reasonable, actual cost of transporting oil from the gross per barrel royalty value. For example, if oil produced from an OCS lease is valued at $20 per barrel on-shore, and it costs $5 per barrel to transport the oil from the OCS lease to another on-shore point, the lessee owes a royalty based on the net $15 value, rather than on the gross $20 value. In this way, the transportation allowance is generally based on a lessee's actual transportation costs. 30 C.F.R. § 206.105(b).

In its 1988 regulations, MMS carved out an exception to the actual cost requirement that allows federal lessees shipping oil via affiliated pipelines to base their transportation allowances on tariffs filed with the Federal Energy Regulatory Commission ("FERC"). This provision, known as the "FERC tariff exception," provides: "The MMS will grant the exception only if the lessee has a tariff for the transportation system approved by [FERC] ..." 30 C.F.R. § 206.105(b)(5). Section 206.105(b)(5) was meant to enable lessees to avoid the "unnecessar[y] burden[ ]" of recomputing costs. 53 Fed.Reg. at 1211. The exception was animated by the policy that FERC could be relied upon to ensure that oil shipping rates in its jurisdiction are reasonable. *Id.* (citing FERC's "expertise ... to determine fair and reasonable transportation charges").

The regulation allows MMS to deny the exception to a lessee who has a FERC-approved tariff in certain specified circumstances:

The MMS shall deny the exception request if it determines that the tariff is excessive as compared to arm's-length transportation charges by pipelines, owned by the lessee or others, providing similar transportation services in that area. If there are no arm's-length transportation charges, MMS shall deny the exception request if: (i) No FERC

or State regulatory agency cost analysis exists and the FERC or State regulatory agency, as applicable, has declined to investigate pursuant to MMS' timely objection upon filing; and (ii) the tariff significantly exceeds the lessee's actual costs for transportation . . . .

§ 206.105(b)(5).

The parties agree that after the 1988 regulations went into effect, requests to MMS to use FERC-approved tariff rates were routinely granted as long as the affiliated pipeline company had a tariff on file at FERC. In fact, the MMS had allowed plaintiffs to use FERC tariff rates to calculate transportation allowances well before the 1988 valuation regulations; this practice had informed the 1988 rule. 53 Fed.Reg. at 1209. Under this scheme, the only action a lessee had to take to satisfy the requirement of § 206.105(b)(5) that a tariff be "approved by [FERC]" was to present proof of a tariff on file with FERC. From MMS's point of view, FERC's acceptance of the filing of a tariff qualified as FERC's "approv[al]" of that tariff under § 206.105(b). 53 Fed.Reg. at 1209 (citing practice of granting exception to FERC-approved tariffs).

At all times relevant to this case, FERC tariffs were authorized by the Interstate Commerce Act ("ICA"), 49 U.S.C.App. § 1(1) (1988), and governed by the FERC regulations at 18 C.F.R. § 341. Those regulations required that each pipeline carrier of crude oil "subject to the Commission's jurisdiction under the Interstate Commerce Act" file a tariff with FERC that sets forth the rates and charges for transportation through the pipeline. 18 C.F.R. § 341.0(a)(1),(b) (1997). Section 341.11(a) states that "[FERC] may reject tariff publications or any other material submitted for filing that fail to comply with the requirements set forth in this part or violate any statute, or any regulation, poli-

cy or order of the Commission." Generally, absent affirmative action by FERC to reject the filed tariff, the tariff was considered "establish[ed]" or "issued" and the pipeline owner was permitted to charge the specified rates. *See* § 341.3 (tariff must include "issue" date, and the "specific Commission order pursuant to which the tariff is issued"); § 346.1 (carriers seeking to "establish" rates must follow, *inter alia,* procedures in § 341). FERC officials have indicated that it was FERC practice to routinely accept tariff filings without an investigation into FERC's jurisdiction over the tariff; jurisdiction was only addressed if a protest was filed with FERC pursuant to § 343. *See* Consolidated Administrative Record (CAR), doc. C50.

Beginning in 1992, FERC issued a series of decisions that called its jurisdiction over certain OCS pipelines into question. *See Oxy Pipeline, Inc.,* 61 FERC 61,051, 1992 WL 276147 (1992); *Bonito Pipeline Company,* 61 FERC 61,050, 1992 WL 409332 (1992), *aff'd sub nom., Shell Oil Co. v. FERC,* 47 F.3d 1186 (D.C.Cir.1995); *Ultramar, Inc. v. Gaviota Terminal Co.,* 80 FERC 61,201, 1997 WL 612369 (1997). FERC did not, however, alter its policy of issuing tariffs without investigation into its jurisdiction after the initial 1992 decisions.

In September of 1994, MMS decided to no longer accept tariffs issued by FERC as automatically qualifying for the FERC exception. The minutes of a August 9, 1994 staff meeting state:

> Consensus was reached that MMS would not recognize FERC Oil Tariffs for which FERC has renounced jurisdiction. MMS would require the calculation of a transportation allowance to be based on actual costs as of October 8, 1992, the date of the OXY/Samedan FERC decision.

CAR, doc. C58, at 156. The minutes of a September 9, 1994, staff meeting state

"Action Items. 1. VSD will change its policy and not approve FERC Oil Tariffs in lieu of computing actual costs." *Id.* The parties dispute the motivation for this change at MMS. Plaintiffs allege that DOI and MMS were politically and financially motivated to eliminate the FERC exception and thereby generate approximately $30 million dollars a year in increased royalties from the oil industry. Defendants claim that FERC's own questioning of its jurisdiction in the 1992 decisions made MMS no longer able to rely on FERC-issued tariffs as "approved by" FERC.

## II. MMS Orders to Plaintiffs and Plaintiffs' Administrative Appeals

Plaintiffs filed tariffs with FERC covering the affiliated pipelines at issue in this case. *See* No. 98–884 AR, Tab 27 (Torch); No. 98–1388 AR Tab 16 (Chevron); No. 98–1388 AR Tab 29 (Exxon); No. 98–1388 AR Tabs 22, 24, 28 (Mobil); No. 98–1388 AR Tabs 19, 34, 35 (Texaco); No. 98–1398 AR Tabs 16, 30, 38, 52 (Unocal); No. 98–1444 AR Tabs 18, 25, 30 (Amerada Hess); No. 98–1444 AR Tab 18, 21, 22 (PennzEnergy); No. 98–2125 AR Tab 24(BPX). FERC did not reject the tariffs for lack of jurisdiction, nor were any protests or challenges filed. Plaintiffs then filed requests with MMS to use FERC's tariff rates to calculate their transportation allowances pursuant to the FERC exception in the regulations. *Id.*

The Chief of the MMS Valuation and Standards Division denied plaintiff's requests for the FERC exception. *See* No. 98–884 AR, Tab 24 (Torch); No. 98–1388 AR Tabs 13, 26 (Chevron); No. 98–1388 AR Tabs 17, 27 (Exxon); No. 98–1388 AR Tabs 20,21, 27 (Mobil); No. 98–1388 AR Tabs 15, 32, 33 (Texaco); No. 98–1398 AR Tabs 48, 49 (Unocal); No. 98–1444 AR Tabs 16, 23, 29 (Amerada Hess); No. 98–

1444 AR Tabs 17, 19, 20 (PennzEnergy); No. 98–2125 AR Tab 23(BPX). That MMS decision cited the 1992 decision by FERC in *Oxy Pipeline* that questioned FERC's jurisdiction over oil transported only on pipelines within the OCS:

> On October 8, 1992, FERC issued the Order Granting Petitions for Declaratory Orders and Disclaiming Jurisdiction, *Oxy Pipeline Inc.*, 61 FERC ¶ 61,051, 1992 WL 276147 (1992), which states in pertinent part ... that the [ICA] does not expressly cover pipelines transporting oil solely on or across the Outer Continental Shelf...

*Id.* MMS stated that since FERC had renounced jurisdiction over pipelines on the OCS, MMS could no longer consider tariffs for those pipelines that had been issued by FERC to be "approved by FERC;" thus, MMS could no longer grant the FERC exceptions for those tariffs. *Id.*[2]

Plaintiffs then appealed those orders to the Director of MMS, Cynthia Quarterman. *See* No. 98–884 AR Tab 22 (Torch); No. 98–1388 AR Tabs 11, 12 (Chevron); No. 98–1388 AR Tabs 16, 26 (Exxon); No. 98–1388 AR Tabs 18, 19, 26 (Mobil); No. 98–1388 AR Tabs 14, 29, 31 (Texaco); No. 98–1398 AR Tabs 46, 47 (Unocal); No. 98–1444 AR Tabs 13, 22, 28 (Amerada Hess); No. 98–1444 AR Tabs 16 (PennzEnergy); No. 98–2125 AR Tab 21(BPX). Plaintiffs claim that while those appeals were pending, Torch received an affirmative determination from the FERC Office of Pipeline Regulation that its pipeline was subject to the provisions of the ICA and was therefore within FERC's jurisdiction. *See* Pls.' Statement of Undisputed Material Facts at

4 ¶ 10 (citing No. 98–884 AR Tab 153 (Torch)). Defendants dispute this fact. *See* United States' Undisputed Material Facts and Response to Pls.' Statement of Undisputed Material Facts at 3 ¶ 6–7.

In addition, in January 1996, while the appeals were still pending, the Director of MMS requested clarification from FERC regarding its jurisdiction over OCS oil pipelines. *See* CAR, doc. C51. On March 15, 1996, then-Chair of FERC, Elizabeth Moler, responded to Director Quarterman, stating that FERC had jurisdiction over pipelines that transport oil in interstate commerce, even if the transportation commences on the OCS. CAR, doc. C50. Using a hypothetical example, Chair Molar stated that oil moving from one point on the OCS to another on the OCS and then moving onshore in interstate commerce was subject to FERC jurisdiction under the ICA. *Id.*

On January 18, 1997, by consolidated decision in response to the appeals of plaintiffs and others, the Associate Director of MMS held that MMS had improperly denied plaintiffs' requests to use the FERC exception. *See* No. 98–884 AR Tab 2 (Torch); No. 98–1388 AR Tab 2 (Chevron), No. 98–1388 AR Tab 2 (Exxon); No. 98–1388 AR Tab 2 (Mobil); No. 98–1388 AR Tab 2 (Texaco); No. 98–1398 AR Tab 2 (Unocal); No. 98–1444 AR Tab 2 (Amerada Hess); No. 98–1444 AR Tab 2(PennzEnergy); No. 98–2125 AR Tab 5(BPX) (substantially the same order issued on June 30, 1997). The decision noted that "[w]ithout FERC's ICA jurisdictional determination for each pipeline, MMS can not discern whether each of the

---

**2.** The parties vigorously dispute the proper interpretation of the FERC administrative decisions with respect to FERC jurisdiction over OCS pipelines. Plaintiffs claim that Oxy Pipeline was limited to oil transported only within the OCS. Defendants argue that Oxy Pipeline, along with other decisions, raises questions about FERC jurisdiction over any oil transported on or from the OCS, including oil that reaches shore. This Court need not resolve the dispute over FERC jurisdiction to decide plaintiffs' APA claim.

Appellant's tariffs are approved (if FERC has no jurisdiction, they cannot by definition, give approval)." *Id.* The decision remanded the appeals to MMS and suggested that MMS, not plaintiffs, should bear the burden of petitioning FERC for a resolution of the jurisdiction question. *Id.*

On August 19, 1997, MMS prepared a draft petition to FERC seeking a declaratory ruling on its jurisdiction over the pipelines at issue here. *See* CAR, doc. C25. No petition was ever formally filed with FERC.

Upon remand, the Assistant Secretary of DOI, Robert Armstrong, assumed jurisdiction over plaintiffs' claims. On February 4, 1998, he issued a series of separate orders to plaintiffs requiring that they calculate their transportation allowances using actual costs rather than the FERC exception. *See* No. 98–884 (Torch) AR, Tab. 1, No. 98–1388 (Chevron) AR Tab. 1; No. 98–1388 AR Tab 1 (Exxon); No. 98–1388 AR Tab 1 (Mobil); No. 98–1388 AR Tab 1 (Texaco); No. 98–1398 AR Tab 1 (Unocal); No. 98–1444 AR Tab 1 (Amerada Hess); No. 98–1444 AR Tab 1 (Pennz-Energy); No. 98–2125 AR Tab 4(BPX). The Assistant Secretary stated that FERC's decisions *in Oxy Pipeline, Bonito Pipe Line,* and *Ultramar* raised questions about FERC jurisdiction over OCS pipelines, and therefore that FERC could no longer "approve" tariffs on those pipelines. The Assistant Secretary concluded that the FERC decisions "clearly define the criteria for determining whether FERC has jurisdiction over crude oil pipelines on the OCS." *Id.* The Assistant Secretary determined that in order for FERC to have jurisdiction, a lessee must demonstrate

that crude oil is transported from the OCS to an adjacent state and then to another state. The Assistant Secretary rejected plaintiffs' appeals because, he stated, plaintiffs had not demonstrated that their oil moved in interstate commerce. *Id.*

Plaintiffs Chevron, Exxon, and Texaco requested that the Assistant Secretary reconsider his February 4, 1998, decision. *See* No. 98–1388 (Chevron) AR Tab. 2A; No. 98–1388 AR Tab 2A (Exxon); No. 98–1388 AR Tabs 2A, 3A (Texaco). On September 24, 1998, the Assistant Secretary denied those reconsideration requests and issued a modified order with respect to plaintiffs and others who had originally appealed the MMS' denial of FERC exception.[3] *See* No. 98–1388 (Chevron) AR Tab. 1A; No. 98–1388 AR Tab 1A (Exxon); No. 98–1388 AR Tab 1A (Mobil); No. 98–1388 AR Tab 1A (Texaco); No. 98–1398 AR Tab 1A (Unocal); No. 98–1444 AR Tab 1A (Amerada Hess); No. 98–1444 AR Tab 1A (PennzEnergy); No. 98–2125 AR Tab 1(BPX) (substantially the same decision issued on November 11, 1998). These modified orders acknowledge that plaintiffs had produced some evidence that their oil traveled in interstate commerce, yet denied the FERC exception nonetheless. The modified orders state that it is necessary for FERC to determine whether it has jurisdiction over pipelines on the OCS. The Assistant Secretary rejected the MMS Assistant Director's earlier suggestion that MMS should petition FERC for a determination of jurisdiction. Instead, the Assistant Secretary told plaintiffs that they must petition FERC themselves to establish jurisdiction prior to being granted the FERC exception. Once a lessee obtained a FERC determination on juris-

---

**3.** The Assistant Secretary's response to Torch Operating Company appears to have differed from DOI's response to the other plaintiffs in one significant way. Torch never received a modified order from DOI. With respect to Torch, the February 4, 1998, decision which does denies the appeal without suggesting returning to FERC for a determination of jurisdiction is the final agency action at issue. *See* No. 98–884 AR, Tab. 1 (Torch).

diction, explained the Assistant Secretary, the MMS "will recognize the FERC tariff as the appropriate allowance, subject to the requirements of 30 C.F.R. § 206.105(b)(5)." *Id.*

DOI's February 4, 1998, and September 28, 1998, decisions are the final agency action challenged by plaintiffs in this suit.

## III. DOI and Congress Battle Over Proposed Rulemaking

At approximately the same time that plaintiffs' appeals to the Director of MMS were pending, DOI issued an Advance Notice of Proposed Rulemaking, indicating that it was "considering amending its regulations regarding the valuation of crude oil produced from or allocated to federal and Indian leases." 60 Fed.Reg. 65610 (Dec. 20, 1995). Approximately one week after the Associate Director of MMS' decision to remand the plaintiff's appeals, on January 24, 1997, DOI issued a Notice of Proposed Rulemaking proposing that the FERC exception, Section 206.105(b)(5) of its regulations, be eliminated. 62 Fed.Reg. 3741 (Jan. 24, 1997). Two days after the Assistant Secretary issued his decision rejecting plaintiffs' appeals, on February 6, 1998, DOI issued a Supplementary Proposed Rule, adding further changes to its proposed rules amending the royalty valuation regulations. 63 Fed.Reg. 6113 (1998).

Then, on May 1, 1998, Congress blocked funding for the proposed amendments. Congress enacted the 1998 Supplemental Appropriations and Rescissions Act, Pub.L. No. 105–174 § 3009, 112 Stat. 58 (1998), which barred the use of any funds "to issue a notice of final rule-making prior to October 1, 1998, with respect to the valuation of crude oil for royalty purposes." On October 28, 1998, Congress enacted yet another appropriations bill, Pub.L. No. 105–277, § 130, 112 Stat. 2681 (1998), extending the rule-making ban until June 1, 1999, or until there was a negotiated agreement on the rule.

In 2000, after the filing of this lawsuit, DOI did successfully revise its regulations through the formal notice and comment rulemaking process and eliminated the FERC exception. *See* 30 C.F.R. § 206.111 (as amended March 15, 2000, effective June 1, 2000). The FERC exception was in place at all times relevant to this lawsuit.

## IV. Procedural History

Plaintiff Torch Operating Company filed suit against defendant Bruce Babbitt, Secretary of the Interior, on April 4, 1998. Civ. Action No. 98–884. Plaintiffs Chevron, Mobil, Exxon, and Texaco filed Civil Action No. 98–1388 on June 2, 1998. Plaintiff Unocal filed Civil Action No. 98–1398 on June 2, 1998. Plaintiffs Amerada Hess and PennzEnergy filed Civil Action No. 98–1444 on June 9, 1998. Plaintiff BPX filed Civil Action No. 98–2125 on September 2, 1998. The five cases were consolidated on September 15, 1998, for purposes of pleading and arguments to the Court on common issues.

Pending before the Court are cross-motions for summary judgment. Plaintiffs filed their joint motion for summary judgment on common issues on March 5, 1999. Pls.' Joint Mot. for Summ. J. on Common Issues (hereinafter "Pls.' Br."). Defendants filed their motion for summary judgment and opposition to plaintiffs' joint motion on April 27, 1999. United States' Mot. for Summ. J. (hereinafter "Defs.' Br."). Plaintiffs filed their opposition to defendants' motion and reply to defendants' opposition on May 18, 1999. Defendants filed their reply on June 24, 1999. This Court heard oral argument from the parties on October 29, 1999.

The Fifth Circuit recently decided the appeal of a case raising a similar challenge to a denied FERC exception, originally filed by Shell Offshore Inc. against the defendants in the instant case in the Western District of Louisiana. *See Shell Offshore Inc. v. Babbitt,* 238 F.3d 622 (5th Cir.2001). The Fifth Circuit in *Shell Offshore* held that DOI's denial of the FERC exception to Shell violated the APA. This Court issued an order to the parties in this case on January 23, 2001, directing them to address the *Shell Offshore* decision. Plaintiffs filed a joint brief on February 6, 2001. *See* Plfs.' Fourth Supp. Submission, concerning *"Shell Offshore"* Decision (hereinafter "Pls.' *Shell Offshore* Br."). Defendant responded on February 14, 2001. *See* United States' Response to Pls.' Fourth Submission, concerning *"Shell Offshore"* Decision (hereinafter "Defs." *Shell Offshore* Br.).

### Discussion

### I.  Standard of Review

■ Summary judgment should be granted pursuant to Federal Rule of Civil Procedure 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.), *reh'g en banc granted,* 124 F.3d 1302 (1997). In ruling upon cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975).

### II.  Issues Presented

This case presents three basic issues. The first is whether DOI's interpretation of the language "approved by [FERC]" in § 206.105(b)(5) is plainly erroneous, and therefore violates the APA. If DOI's denial of the FERC exception stretches the language of the regulation too far, then the Court will enter judgment for the plaintiffs. If DOI's interpretation of that language is permissible, the Court must then turn to whether DOI's interpretation is a significant modification of an earlier interpretation so as to require notice and comment rule-making procedures under the APA. This too could be a determinative issue. However, if DOI did not impermissibly change positions with respect to its interpretation of § 206.105(b)(5), the Court must then address whether DOI's decision was arbitrary and capricious in violation of the APA.

The parties have presented arguments to the Court addressing many issues beyond the three described above. In particular, the parties strongly disagree as to the proper interpretation of the FERC decisions with respect to FERC jurisdiction over OCS pipelines. Because the above issues are dispositive, the Court need not reach the substantive arguments related to FERC jurisdiction.

### III.  DOI's Orders to Plaintiffs Contravene the Plain Language of the MMS Regulation in violation of the APA.

The controversy in this case centers around the words "approved by [FERC]." § 206.105(b)(5). The MMS regulations state that the FERC exception for the transportation allowance calculation will only be granted if the lessee DOI has "a tariff for the transportation system approved by [FERC] . . ." § 206.105(b)(5). In denying plaintiffs' FERC exception requests, DOI interpreted the language "approved by [FERC]" to require not only that a tariff be filed with FERC, but also

that the lessee obtain from FERC an affirmative statement of jurisdiction.[4] *See* No. 98–1388 (Chevron) AR Tab. 1A; No. 98–1388 AR Tab 1A (Exxon); No. 98–1388 AR Tab 1A (Mobil); No. 98–1388 AR Tab 1A (Texaco); No. 98–1398 AR Tab 1A (Unocal); No. 98–1444 AR Tab 1A (Amerada Hess); No. 98–1444 AR Tab 1A (PennzEnergy); No. 98–2125 AR Tab 1(BPX) (substantially the same decision issued on November 11, 1998). The Court holds that DOI's interpretation stretches the meaning of "approved by" too far.[5]

■ Plaintiffs challenge DOI's interpretation under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* The APA commands reviewing courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although agencies are generally given a substantial amount of discretion under the APA when interpreting their own regulations, there is a limit to that discretion. *See, e.g., Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 52 (D.C.Cir.1999). Agency interpretations of their own regulations are consistently afforded deference by federal reviewing courts and are upheld unless "plainly erroneous or inconsistent" with the regulation. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C.Cir.1997). In other words, a reviewing court must defer to an agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)). The plainly erroneous standard creates the "outer limit to that deference imposed by the Administrative Procedure Act." *Paralyzed Veterans*, 117 F.3d at 584.

■ DOI argues that understanding "approved by" to include a requirement of an affirmative statement of jurisdiction is reasonable given the FERC procedures for handling tariff applications. DOI argues that tariffs are simply filed with and "accept[ed]" by FERC: "FERC 'accepts' the tariff but does not further investigate, approve, or, in any manner, examine, the tariffs unless someone files a protest against the tariff." Defs.' Br. at 5. Because FERC only accepts the filed tariffs, DOI argues, requiring the additional affirmative step of affirming jurisdiction prior to recognizing FERC approval is reasonable.

DOI's interpretation of "approved by" ignores the fact that the FERC procedures, authorized by the OCA and reflected in FERC's regulations, were in place at the time the FERC exception was created in 1988. The Supreme Court has said that a reviewing court should defer to an agency interpretation unless an "alter-

---

**4.** With respect to Torch, DOI gave Torch a revised decision suggesting that Torch petition FERC for a jurisdictional determination. Instead, DOI denied Torch's appeal based on its own interpretation of FERC's jurisdiction. For reasons explained in this decision, such a determination by DOI contravenes the plain language of DOI's regulations and is arbitrary and capricious.

**5.** The Fifth Circuit in *Shell Offshore* assumed that the language of this regulation was ambiguous and quickly moved on to the question of the lawfulness of DOI's reversal of interpretation. 238 F.3d at 629. This Court disagrees with that assumption the language "approved by" is not so ambiguous as to allow DOI to require an affirmative statement of jurisdiction.

native reading is compelled by the regulation's plain language or by *other indications of the Secretary's intent at the time of the regulation's promulgation.*" *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381 (emphasis added). Here, defendant's suggestion that the "approved by" language in the FERC exception refer to anything other than the procedures that were in place at FERC at the time the FERC exception was created is implausible. The ICA requires that carriers post tariffs with FERC for public inspection prior to using those tariffs, 49 U.S.C. app. § 6. ICA also requires that those tariffs will be applicable to that pipeline unless a protest is filed with FERC during the notice period, *id.* at § 15(7), or a complaint is successfully pursued. *Id.* at § 13. The carriers who post tariffs are required to adhere to those tariffs unless they have been successfully challenged. Neither the ICA nor the FERC regulations have ever required an advance jurisdictional determination prior to tariffs being given effect. These were the procedures in effect when DOI created the FERC exception that includes the "approved by" language, and these procedures are sufficient "other indications of the Secretary's intent at the time of the regulation's promulgation" to compel an alternative reading than the one that DOI has attempted to give. *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988).

Furthermore, DOI's argument ignores the binding effect given to tariffs filed with FERC. Once a tariff is filed with FERC, the notice period elapses without challenge. If no one files a complaint

challenging jurisdiction, carriers must comply with the terms of the tariff. The distinction between action and inaction that DOI has attempted to draw here is unpersuasive. An agency need not take affirmative steps in order to give something the force of law the tariffs filed with FERC are valid and binding on pipelines unless a successful protest or challenge has been filed. FERC need not take any further affirmative action for the tariff to be considered "approved." The defendant concedes the fact that no protests or challenges prevented plaintiffs' tariffs from being given effect by FERC. That binding effect constitutes the approval of which the DOI regulations speak.

DOI further argues that given the uncertainty over FERC's jurisdiction, created, in DOI's opinion, by certain FERC administrative decisions, DOI could no longer conclude that unchallenged tariffs filed with FERC were "approved by" FERC without an affirmative statement of jurisdiction. Whether or not FERC has jurisdiction over a certain pipeline is a question for FERC to decide, not DOI. *See Amerada Hess Pipeline Co. v. FERC*, 117 F.3d 596, 600 (D.C.Cir.1997). DOI's argument, dressed up in the guise of deferring to FERC's jurisdictional decisions, is actually predicated on DOI's independent assessment that FERC jurisdiction over plaintiffs' tariffs was called into question. DOI made this decision despite the fact that FERC in no way ever questioned its jurisdiction over plaintiffs' tariffs.[6] FERC accepted plaintiffs' filed tariffs without challenge years after the FERC administrative decisions that DOI claims threw

---

**6.** FERC clearly had the authority to decline jurisdiction over plaintiffs' tariffs if it so required. Section 341.11(a) of the applicable FERC regulations states that "[FERC] may reject tariff publications or any other material submitted for filing that fail to comply with the requirements set forth in this part or violate any statute, or any regulation, policy or order of the Commission."

FERC's jurisdiction into question.[7]

Furthermore, DOI's interpretation of "approved by" as requiring lessees to petition FERC for an affirmative statement of jurisdiction is undermined by other language in the regulation which requires MMS to petition FERC with objections. Section 206.105(b)(5) outlines the specific reasons that MMS may deny a FERC exception to an applicant. The procedures for rejecting some applicants require that MMS petition FERC:

> If there are no arm's-length transportation charges, MMS shall deny the exception request if: (i) No FERC or State regulatory agency cost analysis exists and the FERC or State regulatory agency, as applicable, has declined to investigate *pursuant to MMS' timely objection upon filing* . . .

§ 206.105(b)(5) (emphasis added). This language arguably reflects a preference for MMS petitioning FERC with objections rather than requiring the plaintiffs to do so. Had DOI originally intended that "approved by" include a requirement that someone petition FERC for an affirmative statement of jurisdiction, it could have easily included such a requirement in the regulation. While this language requiring MMS to petition FERC regarding its objections is not conclusive with respect to the question of ambiguity in the regulation, it certainly lends support to the argument that DOI's interpretation contravenes the "Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988).

Finally, plaintiffs argue that DOI is requiring a procedure that contravenes longstanding FERC practice. Pls.' Opp'n and Reply at 11. Plaintiffs argue that the provisions of FERC's regulations that allow for protests or challenges to tariff filings were not created to handle lessees' requests for affirmative statements of jurisdiction. See 18 C.F.R. § 343. The defendants respond that plaintiffs would not be required to petition FERC under § 343, but rather under 18 C.F.R. § 385.207(a)(2) which allows for a declaratory judgment from FERC in order to "terminate a controversy or remove uncertainty." This dispute over the legality of affirmative petitions by plaintiffs to FERC for statements of jurisdiction need not be resolved. It is not necessary to decide whether DOI's interpretation of "approved by" as requiring an affirmative statement of jurisdiction conflicts with the FERC regulations, when it so clearly conflicts with its own.

## II. DOI's Interpretation of the MMS Regulation Constitutes an Impermissible Change in Interpretation without Notice and Comment Procedures in violation of the APA.

■ Should doubts persist as to whether DOI has plainly erred in interpreting its own regulation, the Court also agrees with the Fifth Circuit's holding in *Shell Offshore* and concludes that DOI has impermissibly reversed position with respect to its interpretation of § 206.105(b)(5) without providing the notice and comment required by the APA. 238 F.3d at 629—31.

■ Generally, when an agency interprets its own rules those interpretations are afforded deference. *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. However, if an agency gives a rule a sufficiently definite interpretation, and then later fundamentally modifies that inter-

---

**7.** The Court will not address the argument that the political staff at DOI was motivated by political and financial differences with the political staff at FERC. Such an argument is outside of the scope of this Court's review of the subject agency action.

pretation, the agency must follow the procedures set forth in Section 553 of the APA for amending regulations. *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030, 1036 (D.C.Cir.1999); *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579, 586 (D.C.Cir.1997). The D.C. Circuit has explained, "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans*, 117 F.3d at 586. In order to hold that an agency action violates the APA for this reason, the Court must make certain determinations as to both allegedly interpretive agency actions. First, the agency must have adopted an initial interpretation of the rule with sufficient authority. *Compare Paralyzed Veterans*, 117 F.3d 579 (holding that government did not significantly change its interpretation of a regulation because it never "authoritatively adopted a position contrary" to its later interpretation) *with Alaska Professional Hunters*, 177 F.3d at 1031 (holding that agency's longstanding practice was sufficient to constitute initial interpretation). Second, the agency's actions must constitute rule interpretation rather than policy statements that guide the agency in applying the regulation. *See Hudson v. FAA*, 192 F.3d 1031, 1036 (D.C.Cir.1999).

It is undisputed that DOI did not follow notice and comment rulemaking procedures prior to issuing its decisions to plaintiffs denying their FERC exception applications for want of an affirmative statement of FERC jurisdiction.[8] Instead, the parties dispute whether DOI was required to do so under the APA. Relying primarily on the *Shell Offshore, Paralyzed Veterans,* and *Alaska Professional Hunters* decisions, plaintiffs argue that DOI had a long-standing interpretation of the "approved by [FERC]" language that was fundamentally altered when DOI decided to require additional affirmative findings of FERC jurisdiction. *See* Pls.' *Shell Offshore* Br. Defendants respond by arguing that DOI never gave an initial definitive interpretation of "approved by."[9] *See* Def.'s Shell Br.

### A. *DOI's initial definitive interpretation*

This Court agrees with the Fifth Circuit's holding in *Shell Offshore* that MMS' consistent practice of granting the FERC exception to applicants with tariffs successfully filed with FERC reflected a sufficiently definitive agency interpretation of its regulations. 238 F.3d 622 ("Even though Interior never set forth its interpretations of section 206.105(b)(5)'s 'approved by [FERC]' in a written statement, it was undeniably its long established and

---

**8.** In fact, DOI could not have issued notice and comment rulemaking procedures to amend § 206.105(b)(5) even if it had so desired, because in 1998 Congress barred the use of any funds to make such amendments. *See* Pub.L. No. 105–174 § 3009, 112 Stat. 58 (1998); Pub.L. No. 105–277, § 130, 112 Stat. 2681 (1998).

**9.** Defendants actually raise another argument in response to plaintiff's submission of the *Shell Offshore* decision. *See* Defs.' *Shell Offshore* Br., at 6–7. That argument, that the Fifth Circuit "mis-framed the issue" by focus-

ing on DOI's change in interpretation instead of "whether DOI reasonably interpreted the phrase 'approved by [FERC]' as necessarily requiring that FERC must have jurisdiction over the particular pipeline," is simply a restatement of the first argument addressed by the Court above. Contrary to defendants' argument, the question of whether DOI's interpretation of the regulation was a permissible interpretation of the language is not the end of the inquiry. *Paralyzed Veterans,* 117 F.3d at 586.

consistently followed practice to accept tariffs filed with FERC as 'approved' for purposes of section 206.105(b)(5)").

For at least the first six years that the FERC exception was in existence, from 1988 until 1994, MMS consistently granted the exception to oil pipelines whose tariffs properly met FERC's filing requirements and were not subject to successful challenges or rejected by FERC. In denying one of plaintiffs' requests for the FERC exception, the Assistant Director of MMS admitted that granting FERC exceptions for FERC-filed tariffs had been standard practice:

> MMS's regulations did not contemplate for purposes of granting an exception that a tariff must necessarily have been adjudicated, and thus 'approved,' as defined by FERC. In fact, the preamble regarding [the regulation] at 53 Fed. Reg. 1184 (1988), implies that a published tariff, i.e., a tariff filed with FERC and subsequently not rejected by FERC, satisfies the regulation's requisite 'approved' tariff...

No. 98–1388 (Mobil) AR Tab 2, at 4. Moreover, even prior to the regulations' promulgation in 1988, MMS allowed oil companies to use the FERC tariffs to calculate their transportation allowances. *Revision of Oil Product Valuation Regulations and Related Topics,* 53 Fed.Reg. 1184, 1209 (Jan. 15, 1988)("The MMS currently uses FERC-approved tariffs and arm's-length transportation agreements as an accurate indicator of reasonable, actual costs.").

Defendant argues that MMS' long-standing practice can not reflect a sufficiently definitive agency interpretation because there was neither a formal adjudication nor any other official statement in which MMS announced that interpretation. Def.'s *Shell Offshore* Br. at 2—5. Defendant relies on *Alaska Professional Hunters,* 177 F.3d at 1030, *Hudson,* 192 F.3d at 1033 and *Association of American Railroads v. Department of Transportation,* 198 F.3d 944 (D.C.Cir.1999), to argue that the *Paralyzed Veterans* rule requires that an initial rule interpretation occur in a formal adjudication in order for the agency to be held to that interpretation. Defendant, however, places too much weight on the facts of those cases. It is true that the FAA in *Alaska Professional Hunters* had issued a decision. in a formal adjudication that became the basis for the long-standing practice of the agency that eventually was changed. And it is true that both *Hudson* and *American Railroads* distinguish their facts from *Alaska Professional Hunters* based on the presence of the formal adjudication there. However, none of these case indicate that a formal adjudication is a necessary condition for announcing a definitive agency interpretation.

In *American Railroads,* the D.C. Circuit held that the Federal Railroad Administration's issuance of a technical bulletin interpreting a safety regulation did not contravene an established agency interpretation because the evidence of any early interpretation was insufficient. The evidence relied on by plaintiffs consisted of the preamble to the regulation, an email and two letters from agency personnel. The Court found that the preamble did not support plaintiffs argument, and dismissed the email and letters because the agency also produced conflicting documents. The Court held that the agency did not make an initial "express, direct, and uniform" interpretation, but instead that the record reflected the agency's "often chaotic process of considering an unresolved issue." 198 F.3d at 950.

Defendant does not cite the *Paralyzed Veterans* holding directly on this point. In that case the D.C. Circuit held that the plaintiffs had not sufficiently proven an established agency interpretation prior to

the agency's later declared position. The Circuit Court in that case indicated that the threshold for establishing a definitive agency interpretation is much lower than the bar that defendant would set. *Paralyzed Veterans* involved an interpretation of wheelchair access regulations under the Americans with Disabilities Act in a Department of Justice manual. 117 F.3d 579. Plaintiffs claimed that the Department had adopted an earlier interpretation of the regulation contrary to the interpretation offered in the manual. In support of that contention, the Court considered evidence of statements made by an Advisory Board that were never adopted by the Department of Justice, and a speech by a mid-level Department official. *Id.* at 587. The Circuit Court opined that even with such minimal evidence, "the issue is not easy; appellants almost but do not quite establish that the Department significantly changed its interpretations of the regulation . . ." *Id.* at 587.

In contrast to the lack of evidence present in *American Railroads* and *Paralyzed Veterans*, the DOI for years prior to and after the regulation was passed, uniformly and consistently granted the FERC exception to each oil company that applied with a FERC-filed tariff. Every time DOI granted a FERC exception, it was called upon to interpret that regulation. Each of those decisions creates a pattern and practice reflecting a consistent agency interpretation of its regulation. Furthermore, unlike the regulation preamble at issue in *American Railroads*, the preamble of the DOI regulation directly supports plaintiffs' arguments here. In 1988, DOI described the reasons for the FERC exception by stating, "[t]he MMS currently uses FERC-*approved* tariffs and arm's-length transportation agreements as an accurate indicator of reasonable, actual costs." 53 Fed. Reg. at 1209 (emphasis added). The tariffs being accepted by DOI at that time

were tariffs filed with FERC under the same procedures as plaintiffs later used. DOI could have only been referring to that process when it described the tariffs as "FERC-approved." This statement in the preamble to the regulation, combined with the uniform and consistent agency practice of always granting the exception to applicants with a FERC-filed tariff, sufficiently reflects an established agency interpretation of "approved by [FERC]."

### B. *DOI's later modified interpretation*

Both plaintiffs and defendant agree that the Assistant Secretary's action of rejecting plaintiffs' appeals of MMS' denials of the FERC exception reflected a definitive interpretation of § 206.105(b)(5). Defendants do not argue, relying on the distinction recognized by the D.C. Circuit in *Hudson*, that DOI's action was simply a policy statement rather than rule interpretation. *See* Def's *Shell Offshore* Br. at 3 ("there was no definitive interpretation of the phrase 'approved by [FERC]' by MMS in any adjudication before the Assistant Secretary's decision challenged in the instant consolidated case."); *see generally*, Def.'s Reply Br. (referring to "DOI's Interpretation" and section entitled "DOI properly interpreted its Regulation"). Thus, the failure of the Fifth Circuit's decision in *Shell Offshore* to discuss the *Hudson* decision is of no consequence; this Court agrees with the *Shell Offshore* holding.

The Court agrees that the informal adjudication culminating in the Assistant Secretary's rejection of plaintiffs' appeals does reflect a definitive interpretation of the rule. DOI made clear that "approved by [FERC]" was then interpreted to mean that no applicant would be granted the FERC exception without an additional affirmative statement of jurisdiction by FERC.

Because this new interpretation fundamentally modified the DOI's prior long-standing interpretation of "approved by" and was relied upon without the notice and comment procedures required for rule amendments, DOI's action with respect to plaintiffs violated the APA.

#### *Conclusion*

Because DOI's decisions with respect to plaintiffs' requests for the FERC exception violated the APA, those decisions may not be enforced. DOI may not reject plaintiffs' requests for the FERC exception based on a reading of § 206.105(b)(5) that requires an additional determination of jurisdiction from FERC. The Court hereby enters judgment declaring the decisions of DOI at issue in this case unlawful.

#### *ORDER*

For the reasons stated in the Memorandum Opinion filed today, the Court hereby

ORDERED that plaintiffs' joint motion for summary judgment is GRANTED; it is

FURTHER ORDERED that defendant's motion for summary judgment is DENIED; it is

FURTHER ORDERED that the Clerk of the Court enter final JUDGMENT in favor of plaintiffs and against defendant.

IT IS SO ORDERED.