**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 21 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SYMBIOTICS, L.L.C.

　　　　Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

　　　　Respondent,

and

IDAHO RIVERS UNITED,

　　　　Intervenor.

Nos. 02-9541 and 02-9542
(Petitions for Review)
(Ag. Nos. 11873 and 11911)

---

**ORDER AND JUDGMENT**[*]

---

Before **SEYMOUR**, **HENRY,** and **McCONNELL**, Circuit Judges.

In March 2001, Symbiotics filed an application with the Federal Energy

Regulatory Commission (FERC) seeking a three-year preliminary permit pursuant

to 16 U.S.C. § 797(f) to investigate the construction of two hydroelectric projects

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

on the Snake River. FERC denied the permits, relying in part on information gleaned from prior permit applications for projects at the same two sites.

Symbiotics now appeals FERC's denial of the preliminary permits, arguing that the agency (1) failed to provide a sufficient explanation of the reasons for departing from its established policy of granting preliminary permits; (2) acted arbitrarily and capriciously in denying the permits; and (3) violated the rulemaking requirements of the Administrative Procedures Act (APA), 5 U.S.C. § 552, by changing its policy without adopting a formal rule.

Our review of FERC's permitting decisions is narrowly circumscribed. Because we determine that the agency acted neither outside its authority nor arbitrarily and capriciously and because the agency complied with required procedures, we affirm its decisions.


I.  BACKGROUND

1.  The Federal Power Act and Preliminary Permits for Hydroelectric Projects

Under the Federal Power Act, 16 U.S.C. §§ 791a-823, parties seeking to construct power plants on navigable waters of the United States or on United States public lands must obtain a license from FERC before proceeding with construction. The licensing process may be "costly and protracted." See Sierra Club v. FERC, 754 F.2d 1506, 1508 (9th Cir. 1985); 16 U.S.C. § 802(a)(1)

(requiring licensing applications to include "[s]uch maps, plans, specifications, and estimates of cost as may be required for a full understanding of the proposed project").

The Act thus establishes a preliminary permitting scheme. Under 16 U.S.C. § 797(f), FERC may issue preliminary permits allowing parties to gather the information about the proposed project that must be included in subsequent license applications. A preliminary permit grants the holder priority against all other applicants for a license. It thus protects "the entrepreneur willing to invest his time and money in determining exactly where and in what form to propose construction of a project which will be best adapted to a comprehensive plan for improving or developing a waterway and the improvement and utilization of water power development." Wash. Pub. Power Supply Sys. v. Fed. Power Comm'n, 358 F.2d 840, 847 (D.C. Cir. 1966), rev'd on other grounds, Udall v. Fed. Power Comm'n, 387 U.S. 428 (1967)). Permits may be granted for a maximum term of three years.

## 2. The Prior Proposed Projects at Eagle Rock and Star Falls

The preliminary permit applications at issue here concern potential projects on the Snake River in Idaho, one at Eagle Rock and one at Star Falls. Other

companies had previously, and unsuccessfully, proposed hydroelectric projects at both sites.

In 1982, Raft River Electric Company filed a license application for a 47.8 megawatt project at the Eagle Rock site. In 1984, FERC staff filed an environmental impact statement (EIS) recommending denial of the license application, citing a variety of environmental concerns, including the elimination of high quality trout fishing and whitewater boating, the loss of nine miles of riparian vegetation, and the reduction of wildlife populations. Shortly after the EIS was filed, Raft River Electric Company withdrew its application.

In 1984, B&C Energy filed a license application for a 36.8 megawatt project at Star Falls. The company subsequently submitted an amended proposal for a 25.5 megawatt project. FERC staff completed an EIS in 1989, and recommended denial of B&C's application. See Star Falls EIS, at 7-21 to -23; reprinted in Respt's Supl. App. vol. II. In 1994, FERC denied B&C's application, concluding that

> the construction, operation, and maintenance of the Star Falls Project, even with the proposed and recommended mitigative measures, would not be best adapted to the comprehensive development of the Snake River, and would be inconsistent with various comprehensive and resource plans for the Snake River, which aim to preserve the natural scenic beauty, wildlife habitat, and undeveloped historic character of the project site as much as possible.

-4-

B&C Energy, Inc., 69 F.E.R.C. ¶ 61,177 (1994) 1994 WL 708703, at * 8 (emphasis added).

3.  Symbiotics' 2001 applications for the Star Falls and Eagle Rock sites

In March 2001, Symbiotics filed applications for preliminary permits to investigate the construction of hydroelectric projects at Eagle Rock and Star Falls. For the Eagle Rock site, Symbiotics proposed an earth-filled dam, 30 feet high and 350 feet long; a reservoir with a surface area of 250 acres; a power canal, 200 feet long; a steel penstock, 400 feet long; a concrete powerhouse with one generating unit; and a 138-kilovolt transmission line, 2.5 miles long. See Symbiotics, LLC, 99 F.E.R.C. ¶ 61, 100 (2002), 2002 WL 1003929, at *1 (discussing Symbiotics' Eagle Rock application). For the Star Falls site, Symbiotics proposed a diversion dam, 400 feet long and 20 feet high; a resulting reservoir, with a surface area of 14 acres; two steel penstocks, 1300 feet long and 24 feet wide; a powerhouse with two generating units; and a 138 kilovolt transmission line. See Symbiotics, LLC, 99 F.E.R.C. ¶ 61,099 (2002), 2002 WL 1003928, at *1 (discussing Symbiotics' Star Falls application).

4. FERC's  denial of the permit applications

In April 2002, FERC issued orders denying Symbiotics' applications for permits for the Eagle Rock and Star Falls sites.  As to each application, FERC

noted the opposition of various citizens and environmental groups. It then concluded that, even though the preliminary permits themselves would authorize only further investigation of the potential projects—and thus would not affect scenic beauty, wildlife habitat, water quality, or recreational value—the permits should still not be issued.

In support of this conclusion, FERC invoked the prior EIS regarding the Eagle Rock site and its prior order regarding the Star Falls site. FERC acknowledged that for over two decades, the agency had followed a policy of granting applications for preliminary permits unless "a permanent legal barrier preclude[d] FERC from licensing the project." See id. (internal quotation marks omitted); Symbiotics, LLC, 99 F.E.R.C. ¶ 61,100, 2002 WL 1003929, at *2 (quoting City of Summersville v. F.E.R.C.,780 F.2d 1034, 1038 (D.C. Cir. 1986)). However, FERC explained, that policy was partly a response to the increase in permit applications, the majority of which did not involve requests to study sites that had been the subject of a previous application. Id.

In contrast, with regard to the instant Eagle Rock and Star Falls applications, the adverse environmental effects of the projects had already been established in the prior proceedings regarding the same sites. Although those proceedings had concluded eight and eighteen years previously, FERC found no indication that circumstances had changed:

> Where, as here, the Commission staff has previously issued a Final EIS or final environmental assessment in a licencing proceeding, and the document concluded that the unmitigable adverse environmental impacts outweighed the power and other developmental benefits, and in the absence of any indication that those circumstances have changed, it is our judgment that a preliminary permit to study the feasibility of constructing a project at the same site should not issue.

Symbiotics, LLC, 99 F.E.R.C. ¶ 61,100, 2002 WL 1003929, at *3.

Symbiotics filed petitions for rehearing as to both requested permits. In July 2002, FERC issued orders denying both petitions. FERC noted that "based on information filed . . . in recent proceedings involving projects on the Snake, it appears that environmental concerns have sharply heightened since 1984, and . . . it is less likely that new hydropower development will be consistent with current management goals for the river than was previously the case." Symbiotics, LLC, 100 F.E.R.C. ¶ 61,010 (2002), 2002 WL 1404156, at *2; Symbiotics, LLC, 100 F.E.R.C. ¶ 61,004 (2002), 2002 WL 1435880, at *2.

## II. DISCUSSION

In this appeal, Symbiotics first challenges FERC's decision to depart from its policy of granting preliminary permits under § 797(f) in the absence of a permanent legal barrier to the proposed projects. Symbiotics also criticizes the FERC's reliance on the EIS for the prior project at Eagle Rock and on the agency

order for prior project at Star Falls. According to Symbiotics, without current information about the proposed projects' environmental effects and economic benefits, FERC lacked the necessary information to make a reasoned decision. Finally, Symbiotics maintains, in changing its permitting policy, FERC violated the rulemaking provisions of the APA.

FERC's denials of Symbiotics' applications for preliminary permits are final decisions subject to judicial review under the APA, 5 U.S.C. §§ 701-06. See City of Bedford v. FERC, 718 F.2d 1164, 1167-68 (D.C. Cir. 1983). That review is "narrowly circumscribed." Mine Reclamation Corp. v. FERC, 30 F.3d 1519, 1524 (D.C. Cir. 1994) (internal quotation marks omitted). We may overturn FERC's denial of the permits only if the agency (1) acted outside the scope of its authority, (2) rendered an arbitrary and capricious decision, or (3) failed to comply with the required procedures. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994). Here, Symbiotics presents two arguments that FERC acted arbitrarily and capriciously, (A) by failing to adequately explain the grounds for its change in policy, and (B) by denying the permits based upon insufficient evidence. Symbiotics also argues that (C) FERC failed to comply with the rulemaking requirements of the APA.

## A. The Change in FERC's Policy

Under the APA, "the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." Id. at 1575. Moreover, "[t]he agency must make plain its course of inquiry, its analysis and its reasoning." Id. The purposes of this requirement "are to prevent arbitrary agency decisions, provide parties with a reasoned explanation for those decisions, settle the law for future cases, and furnish a basis for effective judicial review." Armstrong v. Commodity Futures Trading Comm'n, 12 F.3d 401, 403 (3d Cir. 1993).

Symbiotics here contends that FERC failed to comply with its obligation to offer a reasoned explanation. According to Symbiotics, FERC merely announced that it would not apply its established policy of granting permits in the absence of a permanent legal barrier to the proposed projects and did not provide a rationale for this decision.

Moreover, Symbiotics maintains that FERC's decisions contain contradictory statements. On the one hand, FERC acknowledged that a company whose permit application has been denied "will not likely be able to provide a substantial, resource-specific analysis showing that environmental circumstances have changed, since developing such detailed information is the purpose of the studies performed during the preliminary permit stage." Aplt's Br. at 10 (quoting Symbiotics, LLC, 100 F.E.R.C. ¶ 61,010 and Symbiotics, LLC, 100 F.E.R.C. ¶

61,004). On the other hand, FERC denied the permit applications because "there [was] no showing that circumstances have changed." Id.

We disagree with Symbiotics' characterization of FERC's orders. In discussing the permit application, FERC explained that the no-permanent-legal-barrier rule had most often been applied to requests to study sites that, in contrast to the Eagle Rock and Star Falls sites, had not been the subject of prior EIS's and licencing proceedings. FERC then explained the significance of this distinction. Unlike the majority of permit applications, the Eagle Rock and Star Falls applications concerned sites about which the agency had already gathered substantial information. That information led the agency to conclude that "unmitigable adverse environmental impacts" outweighed the economic benefits of the proposed projects. Symbiotics, LLC, 99 F.E.R.C. ¶ 61,099 (2002), 2002 WL 1003928, at *2; Symbiotics, LLC 99 F.E.R.C., ¶ 61,100, 2002 WL 1003929, at *3. Absent any evidence that the environmental impact of Symbiotics' proposed projects would be less severe, FERC saw no reason to grant the permits.

This reasoning is sufficient to comply with the requirements of the APA. FERC's orders indicate that the agency concluded that, in light of the environmental effects of the proposed projects, Symbiotics' permit applications were analogous to those foreclosed by a "permanent legal barrier." That

reasoning provides the parties with an adequate explanation of the grounds for the ruling and allows meaningful judicial review.

We are not persuaded by Symbiotics' arguments that FERC's orders contain inconsistent statements that render their reasoning inadequate under the APA. Although, in the passage noted by Symbiotics, FERC did state that a permit applicant would not likely be able to provide detailed information about the environmental effects of the proposed projects, the agency also noted that such an applicant

> could bring to the Commission's attention a significant change (such as the fact that a formerly free-flowing stretch of river was now impounded by a dam or that a reach previously being considered for inclusion in the Wild and Scenic Rivers System had been rejected from such consideration) that would indicate that Commission's staff's prior analysis might no longer hold true.

Symbiitics, LLC, 100 F.E.R.C. ¶ 61,004, 2002 WL 1404156, at *3 n.10; 100 F.E.R.C. ¶ 61,010, 2002 WL 1435880 at *3 n.9. Thus, when FERC referred to evidence of changed circumstances, the agency was not referring to information that would be impossible for a permit applicant to obtain.

Accordingly, we conclude that FERC's orders provided a reasoned explanation of its decision to depart from the permanent-legal-barrier rule in instances in which the same site has been the subject of a prior permit application and there is no indication of changed circumstances.

## B. Evidence Supporting the Denial of the Permits

Symbiotics also maintains that, even if FERC's explanation for departing from the permanent legal barrier rule was adequate, FERC still acted arbitrarily and capriciously by relying on outdated information. Symbiotics reasons that the environmental concerns of the mid-1980s and early 1990s were not necessarily the same as those of the present day. Moreover, mitigation techniques have improved. Thus, it was improper for FERC to rely on the 1984 EIS regarding the Eagle Rock site and the 1989 EIS and 1994 order regarding the Star Falls site.

In its reply brief, Symbiotics further argues that FERC erred by imposing the burden of proof upon Symbiotics to show that circumstances had changed since the agency considered the prior applications. According to Symbiotics, it was FERC that had the burden of establishing that the environmental concerns arising out of the prior licensing applications were still present when Symbiotics applied for these two permits. See Reply Br. at 5-6 (citing Wis. Valley Improvement Co. v. F.E.R.C., 236 F.3d 738, 748 (D.C. Cir. 2001)).

In assessing Symbiotics' arguments, we are mindful that the arbitrary and capricious "standard of review is a narrow one, and we are not empowered to substitute our own judgment for that of [the agency]." City of Albuquerque v. Browner, 97 F.3d 415, 424 (10th Cir.1996). An agency's decision is arbitrary and capricious if

the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Nevertheless, while we give the agency's decision "a presumption of regularity," we must still engage in a "thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).

Upon review of the record, we conclude that FERC did not act arbitrarily and capriciously.

1.  The Eagle Rock Site

As to the Eagle Rock site, the prior EIS noted that

> [i]n Idaho, undisturbed stretches of the Snake River are limited as a result of projects already developed for hydroelectric power and irrigation. The series of dams and reservoirs upstream and downstream of the proposed project, along with a number of proposed projects in the vicinity, illustrate the importance of the remaining undisturbed river stretches, such as the project reach.

Eagle Rock EIS, at 5-19, reprinted in Resp's Supl. App. vol II.

In connection with Symbiotics' 2001 permit application for the Eagle Rock site, FERC invited public comment pursuant to 18 C.F.R. §§ 385.210-.211, and

-13-

.214. FERC received letters from local citizens urging that this section of the river remain undeveloped. One wrote that "[t]his area is the most wonderful area to fish, boat and [do] many other recreational activities in this area. It would be a shame to take away the last stretch of free flowing river." Rec. doc. 6. Another citizen wrote that she had examined the prior EIS and that "so far as I can determine the issues mentioned in that report are the same today as they were then." Id. doc. 7. She asserted that "[a] hydroelectric dam and its concomitant cement structures etc. would destroy the aesthetics of the view for our visitors to Idaho." Id. A third citizen wrote that "this particular area is especially in need of preservation because of its unique geological, historical and cultural heritage" and that "[t]he dam and its structures would destroy one of the few remaining pristine areas along the Snake." Id. doc. 11.

A state senator echoed these concerns. He noted that "[t]he section of river proposed to be dammed is the sole free-flowing 61/2 miles for 40 miles in either direction." Id. doc. 20. He added that "[t]his is the same proposal that was protested and denied by FERC in 1984 in response to the documentation submitted by many local and regional opponents." Id.

A fourth citizen summarized many of these concerns as follows:

> In the sixteen year interval since the issuance of the [1984 EIS], nothing has changed: Not the findings and recommendations of the [EIS]—they are as valid and viable as ever, not the river or its canyon or its riparian

zone, not its Oregon trail history or any of its myriad of physical, historical, and ecological values. There is one aspect though: The river and its environs are loved, treasured, and respected more today . . . than they were two decades ago.

Rec. doc. 27. No citizens submitted comments in favor of the proposal.

In addition, although the United States Department of the Interior expressed no formal objection to granting the permits, its comments to FERC reflect significant reservations about the project. In particular, the Department of the Interior's Regional Environmental Officer noted "considerable concern about the environmental impacts related to the issuance and exercise of the requested preliminary permit." Id. doc. 12. The Interior Department observed that any "preliminary permit should be demonstrated as consistent with a comprehensive plan for the Snake River." Id. If a preliminary permit were issued, the Department added, Symbiotics should initiate the first phase of a consultation process with the U.S. Fish and Wildlife Service, the Oregon Bureau of Fish and Game, the U.S. Bureau of Land Management, the U.S. Bureau of Indian Affairs, and any affected Indian tribe. Id. The Interior Department also expressed concerns about the impact of a hydroelectric project upon fish and wildlife resources and threatened and endangered species. Id. at 2-4.

Finally, an environmental group, Idaho Rivers United, sought to intervene in the FERC proceedings. Rivers United argued that the proposed project would

be inconsistent with Idaho's water quality standards and with the Idaho Department of Fish and Game's goal of "strongly oppos[ing] proposed hydroelectric projects." Rec. doc. 14, at 9 (internal quotation marks omitted).

These comments and arguments demonstrate that FERC had a rational basis upon which to conclude that, regardless of improvements in technology that could mitigate adverse environmental impacts, the value of leaving the Eagle Rock site undeveloped outweighed the value of a hydroelectric project there. The weighing of these considerations is a matter we leave to FERC's discretion. The decision reached by the agency, based upon the previous evaluations and the current commentary and arguments, is not implausible.

2. The Star Falls site

As to the Star Falls site, FERC's 1994 order denying the prior permit application also noted many reasons for leaving it undeveloped–despite measures that could be taken by the applicant to mitigate adverse environmental affects of the proposed hydroelectric project. For example, FERC observed that "Star Falls is the only remaining significant undeveloped waterfall on the Snake River, making it a regionally scarce aesthetic resource that provides a glimpse of the 19th century Snake River landscape and that offers aesthetic opportunities no longer available at more developed falls." B&C Energy, Inc., 69 F.E.R.C. ¶

61,177 (1994), 1994 WL 708783, at * 56. FERC added that "the presence of the dam and other structures would unavoidably convert the project area from an undeveloped, predominantly natural landscape to a hydroelectric facility complex," id. at * 57, and that "t]he existing aesthetic opportunity for solitude, and the secluded and historic setting, would be lost." Id.

In the 1994 order, FERC further noted that allowing a hydroelectric project at the site would be inconsistent with the state of Idaho's Comprehensive State Water Plan for the middle Snake River, which designated the area of the site as "Recreational" and which "prohibit[ed] construction or expansion of dams, impoundments, [and] hydroelectric projects." Id. at * 76. FERC concluded that "the Star Falls Project is inconsistent with the Plan because the dam and reservoir would be prohibited by the Plan." Id.

FERC's 1994 order also cited the Idaho Statewide Comprehensive Outdoor Recreation Plan, which called for "preservation of Idaho's natural heritage, particularly its significant natural, historical, and cultural resources." Id. at * 77. FERC concluded that "the Star Falls Project, as currently proposed by B&C Energy and as supplemented by our recommendations, would be inconsistent" with that plan as well. Id.

In the concluding section of its 1994 order FERC stated,

> The Star Falls is the only undeveloped waterfall remaining
> on the middle section of the Snake River. The residents of

-17-

> Idaho who intervened or commented in this proceeding are unanimous in wanting it to remain so. In view of the aesthetic, ecological, and historic significance of the area, we conclude that the preservation of this stretch of the Snake River Canyon in its historic, undeveloped condition is a far more valuable use of the resource than the proposed development of the site's potential for generating hydroelectric power.

Id. at * 9.

In the 2001-02 proceedings involving Symbiotics' application for the Star Falls cite, Idaho Rivers United also filed a motion to intervene. Rivers United stated that the development of a hydroelectric project at the Star Falls site was still inconsistent with the Idaho's Comprehensive State Water Plan as well as several other comprehensive plans for the area. See Rec. doc. 38, at 9-18 (discussing, inter alia, the Northwest Power Council's Columbia Basin Fish and Wildlife Program, "which designated portions of the Snake River, including the proposed project site, as a protected area where hydropower development is prohibited").

A number of citizens expressed similar objections. One wrote that "it would be tragic to put a hydro plant on this scenic and historic stretch of the Snake River." Rec. doc. 43. Another stated that "[b]uilding a dam at Star Falls would destroy much of the beauty of the area." Id. at doc. 45. The Jerome County Historical Society stated that "[v]isitors from all over are awed and impressed with the history and natural grandeur of [Star Falls]. We as well as

many others are distressed to learn of the plans to destroy this unique historical and geological site for a power plant." Id. at doc. 40.

FERC's 1994 order, as well as the submissions from Idaho Rivers United and affected citizens, provided FERC with a rational basis for denying Symbiotics' permit application. As with the Eagle Rock site, FERC acted within its discretion in concluding that the value of leaving the Star Falls site undisturbed outweighed the value of placing a hydroelectic project there, despite potential technological improvements that would mitigate the effect on the environment.

3. Burden of Proof

We are also unpersuaded by Symbiotics' argument that FERC acted arbitrarily and capriciously by shifting the burden of proof to the permit applicant to prove that circumstances had changed. In the case on which FERC relies, Wisconsin Valley Improvement Co. v. F.E.R.C., 236 F.3d 738, 748 (D.C. Cir. 2001), the court concluded that FERC had acted arbitrarily and capriciously by expressly shifting the burden of proving whether a company had used the government's land without explaining the reason for this "abrupt departure." Here, in contrast, FERC met its own burden; it did not shift the burden of proof to Symbiotics. Instead, after providing sufficient grounds for the initial denial of

the permit applications, FERC merely noted that, in its rehearing petitions, Symbiotics had not demonstrated that the reasons for allowing the Eagle Rock and Star Falls sites to remain undeveloped had changed. This was neither arbitrary nor capricious.

### C. Absence of Formal Rulemaking

Finally, Symbiotics argues that FERC violated the notice and comment provisions of the rulemaking requirements of the APA by changing its policy of granting permits in the absence of a permanent legal barrier without adopting a formal rule.

However, as FERC notes, "agencies are not precluded from announcing new principles in an adjudicative proceeding, . . . and the choice between rulemaking and adjudication lies in the first instance within the agency's discretion." Rupp v. U.S. Dep't of Treasury, 52 F.3d 1510, 1521 (10th Cir. 1995). That is what happened here: in these adjudicative proceedings, FERC formulated a sensible exception to its general policy of granting permits.

Such formulation is permissible in agency adjudication. See Osei v. INS, 305 F.3d 1205, 1210 (10th Cir. 2002) (noting that "an administrative agency is permitted to change rules it created in common law fashion, that is, as a

byproduct of adjudication" as long as it provides a reasoned explanation for doing so).

In arguing to the contrary, Symbiotics relies on a district court case from the District of Columbia—Torch Operating Co. v. Babbitt, 172 F. Supp. 2d 113 (D.D.C. 2001). That case is distinguishable. As FERC observes, Torch holds only that an agency that has interpreted one of its own regulations must comply with the notice and comment procedures before reversing its interpretation of that regulation. Id. at 124-25. Here, FERC did not reverse an interpretation of an enacted regulation. Instead, FERC has developed the principles for granting permits through adjudication.

### III. CONCLUSION

Accordingly, we AFFIRM FERC's decisions denying the preliminary permits for the Star Falls and Eagle Rock sites.

Entered for the Court

Robert H. Henry
Circuit Judge